83 So.2d 20 (1955)
The STATE of Florida, ex rel. Virgil D. HAWKINS, Relator.
v.
BOARD OF CONTROL, a body corporate, et al., Respondents.
Supreme Court of Florida. En Banc.
October 19, 1955.
*21 Horace E. Hill, Daytona Beach, and Robert L. Carter, New York City, for relator.
Richard W. Ervin, Atty. Gen., and Frank J. Heintz, Asst. Atty. Gen., for respondents.
ROBERTS, Justice.
This cause came on for reconsideration in accordance with the mandate of the Supreme Court of the United States entered on May 24, 1954. The history of the case is set forth in State ex rel. Hawkins v. Board of Control of Florida, Fla., 47 So.2d 608; Id., Fla., 53 So.2d 116, certiorari denied 342 U.S. 877, 72 S.Ct. 166, 96 L.Ed. 659; Id., Fla., 60 So.2d 162, certiorari granted 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112. By and through this litigation, the relator seeks admission to the College of Law of the University of Florida on the basis that it is a tax-supported institution, that he is in all respects qualified, and that his admission has been refused solely because he is a member of the Negro race. His admission was denied by this court and his cause dismissed on August 1, 1952, for the reason that there was available to him adequate opportunity for legal education at the Law School of the Florida A. & M. University, an institution supported by the State of Florida for the higher education of Negroes, and that, although the facilities were not identical, they were substantially equal and were sufficient to satisfy his rights under the "separate but equal" doctrine announced by the Supreme Court of the United States in 1896, in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 1144, 41 L.Ed. 256, and subsequent cases. See State ex rel. Hawkins v. Board of Control, supra, 60 So.2d 162.
The relator appealed our decision to the Supreme Court of the United States, where it was considered with other comparable appeals there, one of which was Brown v. Board of Education of Topeka. On May 17, 1954, the Supreme Court of the United States handed down its first opinion in the Brown case, reported in 347 U.S. 483, 74 S.Ct. 686, 691, 98 L.Ed. 873, 38 A.L.R.2d 1180, by which it announced the end of *22 segregation in the public schools and rejected the "separate but equal" doctrine established in Plessy v. Ferguson, supra, in the following language:
"In Sweatt v. Painter, supra (339 U.S. 629, 70 S.Ct. 848 [94 L.Ed. 1114]) in finding that a segregated law school for Negroes could not provide them equal educational opportunities, this Court relied in large part on `those qualities which are incapable of objective measurement but which make for greatness in a law school.' In McLaurin v. Oklahoma State Regents, supra, (339 U.S. 637, 70 S.Ct. 853) the Court, in requiring that a Negro admitted to a white graduate school be treated like all other students, again resorted to intangible considerations: `* * * his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession.' Such considerations apply with added force to children in grade and high schools. To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. * * *
"Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding is amply supported by modern authority. Any language in Plessy v. Ferguson contrary to this finding is rejected.
"We conclude that in the field of public education the doctrine of `separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. This disposition makes unnecessary any discussion whether such segregation also violates the Due Process Clause of the Fourteenth Amendment."
On May 24, 1954, the Supreme Court of the United States 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112 vacated our judgment of August 1, 1952, and directed our reconsideration of the instant case in the light of its opinion of May 17, 1954, in the Brown case, supra, 347 U.S. 483, 74 S.Ct. 686 "and conditions that now prevail." Under order of this court, all pleadings were brought down to date and now pose the single question of whether or not the relator is entitled to be admitted to the University of Florida Law School upon showing that he has met the routine entrance requirements. In its May 17, 1954, opinion in the Brown case, the Supreme Court of the United States reserved jurisdiction for the purpose of making further orders, judgments and decrees and, pursuant to that reservation of jurisdiction, on May 31, 1955, entered a supplemental opinion (reported in 349 U.S. 294, 75 S.Ct. 753, 756, 99 L.Ed. ___, and referred to hereafter as the "implementation decision") in which it said:
"Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal. Accordingly, we believe it appropriate to remand the cases to those courts.
"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power.

*23 "At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a non-discriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.
"While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a non-racial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases.
"The judgments below, except that in the Delaware case, are accordingly reversed and remanded to the District Courts to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases. * * *
"It is so ordered."
Article VI of the Constitution of the United States provides, among other things, the following:
"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (Emphasis added).
The theory of "separate but equal" facilities under which this state has developed its educational system since Plessy v. Ferguson, supra, was decided in 1896, has been abolished by the decision of the Supreme Court in Brown v. Board of Education of Topeka, supra, 347 U.S. 483, 74 S.Ct. 686; and we deem it to be our inescapable duty to abide by this decision of the United States Supreme Court interpreting the federal constitution. It therefore follows that the respondents may not lawfully refuse to admit the relator to the University of Florida Law School merely because he is a member of the Negro race and "separate but equal" facilities have been provided for him at a separate law school. Nor can we sustain the contention of respondents that "the adverse psychological effect of segregation on Negro children on which the case of Brown v. Board of Education, supra, rested would have no application to the petitioner who is a college graduate and 48 years of age," which they present in defense of their action in refusing to admit relator to the University of Florida Law School.
The respondents also state, however, as a third defense to such action, that "the admission *24 of students of the Negro race to the University of Florida, as well as to other institutions of higher learning established for white students only, presents grave and serious problems affecting the welfare of all students and the institutions themselves and will require numerous adjustments and changes at the institutions of higher learning; and respondents cannot satisfactorily make the necessary changes and adjustments until all questions as to time and manner of establishing the new order shall have been decided on the further consideration by the United States Supreme Court * * *" This, in my opinion, constitutes a valid defense to issuance of the peremptory writ at this time.
The "implementation decision" of May 31, 1955, quoted at length above, does not impose upon the respondents a clear legal duty to admit the relator to its Law School immediately, or at any particular time in the future; on the contrary, the clear import of this decision  and, indeed, its express direction  is that the state courts shall apply equitable principles in the determination of the precise time in any given jurisdiction when members of the Negro race shall be admitted to white schools. The Supreme Court of the United States said in that decision that these cases call for the exercise by the courts of the traditional powers of an equity court with particular reference to "its facility for adjusting and reconciling public and private needs," and the "practical flexibility in shaping its remedies." In entering its "implementation decision," it is very likely that the high court had before it, and may well have considered, the decision of this court rendered November 16, 1954, in Board of Public Instruction v. State, Fla., 75 So.2d 832, 837, in which speaking through Mr. Justice Terrell, we discussed the necessity of gradual desegregation, and, among other things, said:
"School systems are developed on long range planning. Since the Brown case reverses a trend that has been followed for generations certainly there should be a gradual adjustment from the existing segregated system to the non-segregated system. This is the more true in most of the states with segregated school systems because plants and physical facilities have not kept pace with the growth of population, hence they are bursting at the seams from overcrowded conditions.
* * * * * *
"* * * When segregation comes in the democratic way it will be under regulations imposed by local authority who will be fair and just to both races in view of the lights before them. If it comes in any other way it will follow the fate of national prohibition and some other `noble experiments'. If there is anything settled in our democratic theory, it is that there must be a popular yearning for laws that invade settled concepts before they will be enforced. The U.S. Supreme Court has recognized this."
The respondents have alleged that the admission of Negroes to the institutions of higher learning under their jurisdiction and control "presents grave and serious problems affecting the welfare of all students and the institutions themselves and will require numerous adjustments and changes at the institutions of higher learning; * * *" And, under the express language of the "implementation decision," this court "may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner." Moreover, the relator has chosen as the vehicle for enforcing his lawful right in this court our extraordinary remedy of mandamus, and it has long been held in this state that the granting of the writ of mandamus "is governed by equitable principles, and that the enforcement of the writ if granted may be modified or postponed in particular circumstances when the carrying it out according to the strict letter of the command would be of no great advantage to the relator but would tend to work a serious public mischief, or result in irreparable injury or embarrassment in the orderly functioning of the government with regard to its financial affairs, unless so restricted." City of Safety Harbor v. State, 1939, 136 *25 Fla. 636, 187 So. 173. See also State ex rel. Carson v. Bateman, 131 Fla. 625, 180 So. 22; State ex rel. Gibson v. City of Lakeland, 126 Fla. 342, 171 So. 227; State ex rel. Bottome v. City of St. Petersburg, 126 Fla. 233, 170 So. 730.
It is our opinion that, both under the equitable principles applicable to mandamus proceedings and the express command of the United States Supreme Court in its "implementation decision" the exercise of a sound judicial discretion requires this court to withhold, for the present, the issuance of a peremptory writ of mandamus in this cause, pending a subsequent determination of law and fact as to the time when the relator should be admitted to the University of Florida Law School; and, to that end and for that purpose, Honorable John A.H. Murphree, Circuit Judge, is hereby appointed as a commissioner of this court to take testimony from the relator and respondents and such witnesses as they may produce, material to the issues alleged in the third defense of the respondents, as follows:
"That the admission of students of the negro race to the University of Florida, as well as to other state institutions of higher learning established for white students only, presents grave and serious problems affecting the welfare of all students and the institutions themselves, and will require numerous adjustments and changes at the institutions of higher learning; and respondents cannot satisfactorily make the necessary changes and adjustments until all questions as to time and manner of establishing the new order shall have been decided on the further consideration thereof by the United States Supreme Court, at which time the necessary adjustments can be made as a part of one over-all pattern for all levels of education as may be finally determined, and thereby greatly decrease the danger of serious conflicts, incidents and disturbances,"
and with directions to file a transcript of such testimony without recommendations or findings of fact to this court within four months from the date hereof; such testimony to be limited in scope to conditions that may prevail, and that may lawfully be taken into account, in respect to the College of Law of the University of Florida.
We adopt this procedure pursuant to the directive of the "implementation decision" to the effect that we retain jurisdiction "during this period of transition" so that we "may properly take into account the public interest" as well as the "personal interest" of the relator in the elimination of such obstacles as otherwise might impede a systematic and effective transition to the accomplishment of the results ordered by the Supreme Court of the United States. Based upon such evidence as may be offered at the hearing above directed, this court will thereupon determine an effective date for the issuance of a peremptory writ of mandamus.
It is so ordered.
DREW, C.J., and HOBSON and THORNAL, JJ., concur.
TERRELL, J., concurs specially.
THOMAS and SEBRING, JJ., concur in part and dissent in part.
TERRELL, Justice (concurring with ROBERTS, Justice).
I agree with the opinion of Mr. Justice ROBERTS. Were it not for the far-reaching effect of Brown v. Board of Education of Topeka, hereinafter referred to as the Brown Case, I would refrain from expanding my concurrence. The Brown Case, reported in 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180, was decided May 17, 1954. The gist of the court's opinion rejected the doctrine of "separate but equal", pronounced in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, and held that racial segregation in the public schools was discriminatory and unconstitional and had no place in the field of public education.
*26 The case was restored to the docket for further consideration with reference to formulating a final decree which was promulgated May 31, 1955, reported in 349 U.S. 294, 75 S.Ct. 753, 756, 99 L.Ed. 1083. (Pertinent part of text quoted in opinion of Mr. Justice ROBERTS.) It reiterated the holding of May 17, 1954, but remanded the cause to the Federal Court from which it originated with instruction to consider problems related to administration arising from physical condition of school plant, school transportation system, personnel, revision of school districts, attendance areas, local laws and regulations that may be proposed by school authorities to effectuate a transition to racially nonsegregated schools.
The inferior federal courts, said the Supreme Court, may determine whether or not proposals to implement the decision are sufficient to establish a racially nondiscriminatory school system. In implementing its determination that racial discrimination in the public schools is unconstitutional, the inferior federal courts, sitting as courts of equity, "will be guided by equitable principles * * * characterized by a practicable flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs."
This opinion will be directed to a discussion of what I conceive to be the import of the last sentence in the preceding paragraph. It is not a criticism of the Brown Case but a defense of the equities herein pointed out and others that may arise. I trust that it will be of aid to school authorities in working out this vexatious problem. Florida and every state with a segregated school system will be confronted with a host of problems in shifting from a segregated to a nonsegregated school system. Some of these problems will be common but many of them will be different. In requiring the inferior federal courts to be "guided by equitable principles * * * characterized by a practicable flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs", what did the Supreme Court mean? The answer to this question is the most important aspect of the decision because it is not only the guide for inferior federal courts to interpret the proposals of local school authorities to comply with the law, but the Department of Education will be expected to follow it in shaping its pattern for a desegregated university and public school system.
The Brown Case throws no light whatever on this point, nor are we enlightened by a study of the facts in that case. It arose in the State of Kansas where less than three percent of its school population is Negro. There is a respectable body of opinion in the country which subscribes to the view that transition from segregated to desegregated schools in states where the Negro population is very small, not exceeding eight or ten percent of the whole population, will be a simple matter. This is true because many of these states have never had a segregated system and those which have had such a system have not been required to incur the heavy burden that the segregated school system requires.
In Florida the ratio of white school population to Negro school population is approximately 79 to 21. In some of the states with segregated schools the ratio of white to Negro school population is approximately 50 to 50. Other segregated states have ratios between these two extremes. In said states, segregation has been the school pattern since the public school system was instituted. Billions of dollars have been expended by them in providing and improving physical school facilities, the preparation of teachers and provision for other equipment to raise the general standard of education. All of this expenditure was based on legislative and judicial assurance that it was proper school policy. Plessy v. Ferguson, supra, and other cases, upholding the doctrine of "separate but equal" facilities for the races heretofore alluded to. Now after generations the same court which decided Plessy v. Ferguson, and after the states with segregated school systems in reliance on it had spent many billions of dollars in providing the latest approved school equipment, has decided that it is unconstitutional and must be discarded. This in the face of the fact that there is no local agitation for the change. It seems to me that these circumstances *27 suggest equity enough to stay desegregation until the schools provided in reliance on the doctrine of Plessy v. Ferguson have ceased to be adequate and must be replaced by others to meet the new requirement.
There is an intangible aspect to the integrated school question that speaks louder for equity than the one discussed in the preceding paragraph. It has to do with the diverse moral, cultural and I.Q. or preparation response of the white and Negro races. It may also be said to embrace the economy of the Negro teachers. Account of the differential these factors present, it is a matter of common knowledge that whites and Negroes in mass are totally unprepared in mind and attitude for change to nonsegregated schools. The degree of one's culture and manners may resolve these differentials, but they will not resolve under the impact of court decrees or statutes. Closing cultural gaps is a long and tedious process and is not one for court decrees or legislative acts. I content myself with merely calling attention to this aspect of the segregation question. The confusion, frustration and disaster that will result from failure to take it into account can best be presented to the federal courts and adjudicated by them when a concrete case arises making it necessary to invoke "equitable principles characterized by practicable flexibility." There is no known yardstick to measure the equity that this observation may provoke. Innate deficiencies in self-restraint and cultural acuteness always engender stresses, especially when they are infected with a racial element that is difficult to control.
Since the effect of desegregation on Florida is of primary concern at the present, it would be impressive to consider a concrete example at close range. The ratio of white to Negro population in Leon County is 60 to 40. Most of the Negroes are residents of the section known as "Frenchtown" and the area near "Bond School." In fact Lincoln High and Bond School are located to accommodate these communities. Leon High, Sealey, Kate Sullivan and others are located to accommodate white children in the communities surrounding them. The whites and the Negroes in other words voluntarily segregate themselves by community. Leon County has millions of dollars invested in school plants and school facilities all of which are crowded. This is the rule in Florida and in other areas in states where segregation is the rule. If "equitable principles characterized by practicable flexibility" is to be the rule, can desegregation mean that the public school program of Leon County is to be scrapped and another instituted at the cost of millions to the taxpayers so that Negro and white children can attend the same school. Reduced to the language of the street, "equity" or "equitable principles" is nothing more than a polite name for the plowboys' concept of justice.
In the western part of the City of Tallahassee, Florida State University with approximately 7,000 white students is located and in the southwestern part of the city, about one mile away, Florida A. & M. University with approximately 3,000 colored students is located. The state has many millions of dollars invested in buildings and equipment to administer these institutions, both of which are crowded. If "equitable principles characterized by practicable flexibility" is to be the guide, does desegregation mean that attendance at these institutions is to be scrambled and one of them abandoned and the other enlarged at great expense in order that white and Negroes may attend the new school? A negative answer to this question would appear to be evident.
I might venture to point out in this connection that segregation is not a new philosophy generated by the states that practice it. It is and has always been the unvarying law of the animal kingdom. The dove and the quail, the turkey and the turkey buzzard, the chicken and the guinea, it matters not where they are found, are segregated; place the horse, the cow, the sheep, the goat and the pig in the same pasture and they instinctively segregate; the fish in the sea segregate into "schools" of their kind; when the goose and duck arise from the Canadian marshes and take off for the Gulf of Mexico and other points in the south, they are *28 always found segregated; and when God created man, he allotted each race to his own continent according to color, Europe to the white man, Asia to the yellow man, Africa to the black man, and America to the red man, but we are now advised that God's plan was in error and must be reversed despite the fact that gregariousness has been the law of the various species of the animal kingdom.
In a democracy, law, whether by statute, regulation or judge made, does not precede, but always follows a felt necessity or public demand for it. In fact when it derives from any other source, it is difficult and often impossible to enforce. The genius of the people is as resourceful in devising means to evade a law they are not in sympathy with as they are to enforce one they approve. The early patriots turned Boston harbor into a teapot one night because they did not like the tax on tea. President Jackson is said to have once defied the order of the Supreme Court and challenged them to enforce it. He did not subtract from his fame or his integrity in doing so. Our country went to war to overthrow the Dred Scott decision and prohibition petered out, was made a campaign issue and was repealed because sympathy for it was so indifferent that it could not be enforced.
States with segregated schools have them from a deep-seated conviction. They are as loyal to that conviction as they are to any other philosophy to which they are devoted. They are as honest and law-abiding as the people of any state where desegregation is the rule. Convinced as they are of the justice of their position, they will not readily renounce it if they are required to forfeit abruptly their conviction and their investment, are not convinced that their position is wrong or are required to adopt a system not shown them to be an improvement over the one they are required to forfeit.
If "equitable principles characterized by practicable flexibility" is to be the polestar to guide the courts and school authorities in the solution of this question, I think the potential sources of equity pointed out herein are so impelling that desegregation in the public schools must come by sane and sensible application of the equities pointed out herein, including others that will arise, to the facts of the particular case. I think the local school authorities have the character, integrity and the good judgment required to do this. The Supreme Court used the Brown case as the criterion to evolve the decree that we are confronted with, the circumstances out of which it arose are so different from those which precipitated the case at bar that I do not think it (Brown Case) rules the instant case. It is true that cases from South Carolina, Virginia and the District of Columbia were before the court and were considered with the Brown Case but the latter appears to have been the basis of decision. Desegregation in the public schools will be much more difficult than desegregation in the institutions of higher learning.
In the case at bar relator seeks entry to the law school, comparable to the graduate school of the University of Florida. I think when required showing is made his case will be ultimately controlled by Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149; Sipuel v. Board of Regents, 322 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; Lucy v. Adams, 76 S.Ct. 33, and similar cases, but I think the pleadings here raise questions or equities that should be resolved by evidence. The opinion of Mr. Justice ROBERTS provides the orthodox method to explore these equities for which I feel impelled to concur.
It is so ordered.
SEBRING, Justice (concurring in part and dissenting in part).
This cause is now before the Court for a reconsideration of the issues, pursuant to the mandate of the Supreme Court of the United States entered May 24, 1954.
For a complete history of the case see State ex rel. Hawkins v. Board of Control of Florida, Fla., 47 So.2d 608; Id., Fla., 53 So.2d 116, certiorari denied 342 U.S. 877, 72 S.Ct. 166, 96 L.Ed. 659; Id., Fla., 60 So.2d 162, *29 certiorari granted 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112.
The cause was initiated by the relator, Hawkins, when he filed a petition for an original writ of mandamus to require the Board of Control of Florida to admit him as a student to the College of Law of the University of Florida, a tax-supported institution maintained for white persons only. In his petition Hawkins averred that he possessed all the educational and moral requirements and qualifications necessary for admission to the College but that the Board had refused to admit him solely because he was a Negro.
In a return filed to an alternative writ issued in the cause the respondents admitted that they had refused to admit Hawkins to the College of Law of the University of Florida but that they had offered to admit him to the College of Law of the Florida A. & M. University, a tax-supported institution established and maintained for Negro students only, and that at the latter institution he would be afforded opportunities and facilities for study that were substantially equal to those afforded white students at the University of Florida.
After the return had been filed, the respondent filed a motion for the entry of a peremptory writ the return notwithstanding on the ground that the return showed affirmatively that the relator was entitled to the relief for which he had prayed. The motion was denied, and the cause was dismissed on August 1, 1952, for the reason that although the facilities offered members of the white and Negro races to obtain an education were not identical they were substantially equal and this satisfied the requirements of the Fourteenth Amendment to the Federal Constitution, under the principle enunciated in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, and kindred cases.
After the judgment had been entered the relator filed a petition in the Supreme Court of the United States for a writ of certiorari to review the judgment. On May 24, 1954, that court granted the petition for certiorari, vacated our judgment, and remanded the cause to this Court with directions that the cause be reconsidered "in the light of the Segregation Cases decided May 17, 1954, Brown v. Board of Education, etc., and conditions that now prevail * * * in order that such proceedings may be had in the said cause, in conformity with the judgment and decree of this [United States Supreme] Court above stated, as, according to right and justice, and the Constitution and laws of the United States, ought to be had therein. * * *" State ex rel. Hawkins v. Board of Control, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112.
Pursuant to the mandate of the Supreme Court of the United States, this Court, on July 31, 1954, entered an order directing the relator to amend his original petition in mandamus "so as to place before this Court the issues raised by the original petition `in the light of the Segregation Cases decided May 17, 1954, Brown v. Board of Education, etc., and conditions that now prevail,'" and directing the respondents "to amend their return so as to present to this Court any answer they may have to said amended petition which will enable this Court to carry out the mandate of the Supreme Court of the United States."
Thereafter, the relator filed an amended petition in which he averred, in substance, that he possessed all the educational and moral qualifications necessary for admission to the College of Law of the University of Florida; that he had an A.B. degree from Lincoln University, Pennsylvania; that he had duly applied for admission to said College of Law but had been refused admission "solely because of certain provisions of the Constitution and Statutes of the State of Florida which deny the right of your petitioner admission to the said University solely because of * * * petitioner's race and color, thus denying * * * petitioner the equal protection of laws solely on the ground of his race and color, contrary to the Constitution of the United States * * * that in addition to the College of Law of the University of Florida, the board of Control by legislative authority and from public funds has established, supported and maintained the Florida Agricultural and Mechanical *30 College of law specifically for Negroes only;" that the Board has "refused to admit your petitioner to the University of Florida solely because of race and color but have offered admittance to the Florida Agricultural and Mechanical College of Law on the basis of his race and color. That the arbitrary and illegal refusal and offer of admittance to the respective colleges by the respondents are in violation of the equal protection of the laws guaranteed by the Constitution of the State of Florida and of the United States in light of the decision handed down on May 17, 1954 by the Supreme Court of the United States in Brown v. Board of Education. That the separate educational facilities hereinbefore alleged are inherently unequal. That by virtue of the segregation complained herein your petitioner has been deprived of the equal protection of the laws guaranteed under and by virtue of the 14th amend [sic] of the Constitution."
In due course the respondents filed an amended return to the amended petition admitting all of the material allegations of the return, except that they denied that the separate educational facilities which respondent had been offered were unequal, and denied that the segregation complained of deprived the relator of the equal protection of the law guaranteed to him by the Fourteenth Amendment to the Constitution of the United States.
The cause is now before this Court for final decision on the amended petition, the amended return, and the motion of the relator for a judgment in his favor the allegations of the amended return to the contrary notwithstanding.
Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 691, 98 L.Ed. 873, 38 A.L.R.2d 1180, which we have been directed by the Supreme Court of the United States to consider in our determination of the right of the relator to the relief prayed, was decided on May 17, 1954, some nine months after the judgment of dismissal was entered by this Court in the case at bar. It was a suit brought by a Negro to gain admission to a public school maintained exclusively for white children and involved the question as to whether or not the "segregation of children in the public schools solely on the basis of race, even though the physical facilities and other `tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities." Except for the fact that the school facilities involved were maintained for grade and high school students, and not for college students, the essential facts in the Brown case are identical with those presented by the amended petition of the relator.
In arriving at its conclusion that the facilities maintained by the Board of Education of the City of Topeka did not afford to the children of that city the equal educational opportunities which the Federal Constitution requires, the Supreme Court of the United States had this to say:
"In Sweatt v. Painter [339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114], [this Court] in finding that a segregated law school for Negroes could not provide them equal educational opportunities * * * relied in large part on `those qualities which are incapable of objective measurement but which make for greatness in a law school.' In McLaurin v. Oklahoma State Regents, (339 U.S. 637, 70 S.Ct. 853 [94 L.Ed. 1149],) * * * the Court, in requiring that a Negro admitted to a white graduate school be treated like all other students, again resorted to intangible considerations: `* * * his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession.' Such considerations apply with added force to children in grade and high schools. To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. * * *
"Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson [163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256], this finding is amply supported by modern authority. Any language *31 in Plessy v. Ferguson contrary to this finding is rejected. (Emphasis supplied.)
"We conclude that in the field of public education the doctrine of `separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. * * *"
As we have noted, this Court, in reaching its conclusion in the case at bar, that the facilities offered by the State of Florida to the relator Hawkins afforded him the equal educational opportunities guaranteed by the Federal Constitution, relied heavily, if not entirely, upon the principle stated in Plessy v. Ferguson, supra, respecting the effect of the Fourteenth Amendment upon state laws and regulations requiring segregation of races in state supported institutions: "The object of the [Fourteenth] amendment was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation, in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which have been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced. * * * The distinction between laws interfering with the political equality of the Negro and those requiring the separation of the two races in schools * * * has been frequently drawn by this court." [163 U.S. 537, 16 S.Ct. 1140.]
But now that the Supreme Court of the United States had expressly repudiated the long-standing principle established in Plessy v. Ferguson, supra, so far as it relates to public education, the only Federal judicial guide that we have as to what the States must do in order to provide "equal educational opportunities" to its citizens, within the purview of the Fourteenth Amendment to the Federal Constitution, is that laid down in Brown v. Board of Education, supra, which expressly holds "that in the field of public education the doctrine of `separate but equal' has no place."
That it is our judicial duty to give effect to this new pronouncement cannot be seriously questioned. For the Federal Constitution, which all Florida judges have taken a solemn oath to "support, protect and defend", Article XVI, Section 2, Constitution of Florida, F.S.A., specifically provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Article VI, Constitution of the United States. (Emphasis supplied.) Therefore, whatever may be our personal views and desires in respect to the matter, we have the binding obligation imposed by our oath of office, to apply to the issue at hand the Federal Constitution, as presently interpreted by the Supreme Court of the United States, and in its application to recognize and give force and effect to this new principle enunciated in Brown v. Board of Education, supra, that the doctrine of "separate but equal" facilities, upon which the original decision of this Court was based, and upon which the respondents now bottom their defense to the amended petition of the relator, has no place in the field of public education in Florida, even though our own Constitution and statutes contain provisions that require in our schools the separation of the races.
While it might be suggested that the principle enunciated in Brown v. Board of Education, supra, is not binding upon us, under *32 the facts of the case at bar, because the cause in which the principle was stated involved grade and high schools and not institutions of higher learning, we think that a close analysis of the opinion in the Brown case, and of the decisions upon which the court bottomed its conclusion, make it plain that the principle was meant to apply to public schools at all levels. For, as is specifically pointed out in the Brown case, the court, in reaching its conclusion that the doctrine of separate but equal facilities has no place in the field of public education, relied on its earlier case of Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114, which involved the right of a Negro to attend the law school of the University of Texas, an institution maintained under the Constitution of Texas for white persons only. It also relied on, and brought forward into the Brown opinion, what it had said, in effect, in McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 853, 94 L.Ed. 1149, that a Negro student, whom the court had required the State of Oklahoma to admit to a graduate school maintained by the State for white persons only, must be accorded the same treatment as a white student  that the furnishing of equal educational opportunities to a Negro student at any educational level involved something more than equal physical facilities, and required that he be afforded the full opportunity, without discrimination to mingle freely with white students so that he could exchange views and engage in full discussion with them "and, in general * * learn his profession."
It is clear from these citations, and from the action of the Court in respect to our own judgment of dismissal in the instant case, that the new doctrine formulated in Brown v. Board of Education, supra, to the effect that in order for educational opportunities to be equal they must also be identical, was meant to apply to tax-supported schools at every level; because under the order that was entered by the Court in the case at bar, the judgment of this Court, which was based upon the doctrine of "separate but equal" was vacated and set aside, with directions that the cause be reconsidered in the light of the Segregation Cases, Brown v. Board of Education, decided May 17, 1954, 74 S.Ct. 686, "in order that such proceedings may be had * * * in conformity with the [said order] * * * as, according to * * * the Constitution and laws of the United States, ought to be had therein. * * *" (Emphasis supplied).
In considering, from this point of view, the case presently before us, it should be noted that in its opinion in the Brown case, decided May 17, 1954, the Supreme Court of the United States expressly retained jurisdiction of the cause and the parties, in order to have "the full assistance of the parties in formulating decrees"; and that on May 31, 1955, after extensive argument by the parties and amici curiae, a final opinion and judgment was entered in the cause. Brown v. Board of Education of Topeka, and companion cases, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. While it is elementary that the opinion and judgment dated May 31, 1955, is binding only upon the parties that were actually involved in the cases in which it was entered, it cannot be doubted that in the rendition of its opinion and judgment the court laid down certain principles and rules which we must follow in the instant case in determining the nature of the relief that should be afforded the relator:
"The opinions of [May 17, 1954] declaring the fundamental principle that racial discrimination in public education is unconstitutional, are incorporated herein by reference. All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle. * * * Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. * * * At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call *33 for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreements with them. * * *"
When these principles and rules are applied to the facts revealed by the pleadings in the instant case, it is clear that no lawful reason has been shown by the respondents as to why the relator should not be admitted to the College of Law of the University of Florida on the same basis as any white student. As we have heretofore stated, the fact, averred in the amended return of the respondent, that the State of Florida maintains a Law College exclusively for Negroes at the Florida Agricultural and Mechanical University to which the relator has been offered admittance, fails to present, under Brown v. Board of Education, a valid defense to the action. The second defense presented by the respondents, that the relator is now more than 48 years of age and, consequently, "the adverse psychological effect of segregation on Negro children on which the case of Brown v. Board of Education, supra, rested would have no application to the petitioner who is a college graduate and 48 years of age," does not, in our opinion, present a valid defense to the action.
The third defense presented by the respondents is that "the admission of students of the Negro race to the University of Florida, as well as to other institutions of higher learning established for white students only, presents grave and serious problems affecting the welfare of all students and the institutions themselves and will require numerous adjustments and changes at the institutions of higher learning; and respondents cannot satisfactorily make the necessary changes and adjustments until all questions as to time and manner of establishing the new order shall have been decided on the further consideration by the United States Supreme Court. * * *" (Emphasis supplied).
In respect to this defense, it must be noted that on May 31, 1955, which was more than six months after the respondents had filed their amended return, the Supreme Court of the United States rendered its opinion and judgment "establishing the new order" to which the respondents refer in their amended return. And in the establishment of the "new order" it specifically stated that "at stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis;" and that the effectuation of this interest "may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the Constitutional principles set forth in [the] May 17, 1954, decision." It also said that while the courts "may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. * * * The vitality of these constitutional principles cannot be allowed to yield simply because of disagreements with them. * * *"
Undoubtedly certain adjustments will have to be made by the respondents to accommodate the desires of the relator to attend the College of Law of the University of Florida. But it is impossible for us to believe, when we confine, as we must, our consideration of the issues to the case made by the pleadings, that these adjustments will be of such a major nature that the constitutional right of the relator to attend the school of his choice should be denied at this time simply because of the inconveniences that may be suffered by the respondents in eliminating the administrative obstacles that now prevent his attendance.
I am of the opinion, therefore, that the amended return of the respondents fails to present any valid defense to the allegations of the amended petition and that consequently a peremptory writ in favor of the relator should be issued commanding the respondents to consider the application of the relator for admission to the College of *34 Law of the University of Florida on precisely the same basis that the respondents would consider the application of a white person, and that if, upon this basis, the relator is found to have the necessary qualifications for admission, he should be admitted to the College of Law of the University of Florida under the same rules and regulations, and upon the same conditions, that a white person would be admitted.
THOMAS, Justice.
In view of the decision of the Supreme Court of the United States cited in the mandate of that court issued in this case, I think this court has no alternative but to grant the motion for a peremptory writ notwithstanding the answer so I concur in the conclusion of SEBRING, J., that such should be the disposition of this controversy now.