LEWIS, J., dissenting.
My friends and colleagues in the majority make a very grave and harmful mistake today. Although I understand their good-faith and well-intentioned approach, only time will truly reveal the depth of the injury inflicted upon Florida's children. The words describing the right to a high quality education and the constitutional concept of protecting that right ring hollow without a remedy to protect the right.
The Florida Constitution guarantees each child the right to a high quality education. Art. IX, § 1(a), Fla. Const.; Scavella v. School Bd. of Dade Cty. , 363 So.2d 1095, 1098 (Fla. 1978) ("[A]ll Florida residents have the right to attend this public school system for free."). When that right is infringed upon by the Legislature, the Department of Education, a county school board, or some other entity, our children must have the opportunity to seek a remedy in the courts. Art. I, § 21, Fla. Const. ("The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay."). This proposition seems too basic to consume much ink here:
The Government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right.
Marbury v. Madison , 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803). Here the majority now places Florida among the very few other states which are in disagreement with regard to whether these educational type claims are justiciable. In my view, article IX, section 1(a) clearly presents many justiciable questions that Florida courts can and should decide. See The Federalist No. 80, at 507-08 (Alexander Hamilton) (R. Scigliano ed. 2000) ("The first point depends upon this obvious consideration, that there ought always to be a constitutional method of giving efficacy to constitutional provisions."). This Court has already decided that article IX, section 1(a), Florida Constitution, is justiciable, and most other states which have addressed the issue have held the same. I write separately, however, to emphasize the propriety of Florida courts addressing these claims.
Our Florida Constitution is a principled document, constructed with principled words, which produces principled concepts that our citizens have asserted as the organic law of our society. It is a dereliction of our duty as the ultimate arbiter of Florida constitutional law to conclude that the interpretation of that text is beyond our grasp and solely within the realm of legislative whims. We have a responsibility to interpret and apply the rights and principles set forth in the Constitution, including article IX, section 1(a). Dade Cty. Classroom Teachers Ass'n v. Legislature of Fla. , 269 So.2d 684, 686 (Fla. 1972) ("When *158 the people have spoken through their organic law concerning their basic rights, it is primarily the duty of the legislative body to provide the ways and means of enforcing such rights; however, in the absence of appropriate legislative action, it is the responsibility of the courts to do so."); see Marbury , 5 U.S. (1 Cranch) at 177 ("It is emphatically the province and duty of the judicial department to say what the law is."). If we, as common law judges, do not discharge our duty to interpret the Constitution-even in complex and at times largely passionate cases-then constitutional protections would never have life. Therefore, the onus falls on this Court to ensure that the principles enshrined by Floridians in our Constitution have meaning and a field of operation, including the right to a high quality education. See Zivotofsky v. Clinton , 566 U.S. 189, 194-95, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012) ("In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.' " (quoting Cohens v. Virginia , 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) ) ).
A "narrow exception" to the rule of judicial review is made for nonjusticiable political questions. Id. To be sure, the doctrine of nonjusticiability is proper in some cases under certain circumstances: for instance, when "there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.' " Nixon v. United States , 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (quoting Baker v. Carr , 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ).[22] Yet, in my view, neither of those elements are present here.
Preliminarily, "courts must, in the first instance, interpret the text in question and determine whether and to what extent the issue is textually committed." Nixon , 506 U.S. at 228, 113 S.Ct. 732. Both the First District Court of Appeal below and the Respondents argue that the inclusion of the phrase "by law" in article IX, section 1(a) somehow places the entire field of education as within the exclusive, unreviewable province of the legislative and executive branches. That logic is flawed. "By law" is a common phrase in our Constitution-used on 155 occasions-simply to signify that some legislation in the area is either permissible or necessary. See Ison v. Zimmerman , 372 So.2d 431, 434 (Fla. 1979) ; Fla. Carry, Inc. v. City of Tallahassee , 212 So.3d 452, 460 (Fla. 1st DCA 2017). Perhaps nowhere is the fallacy of this reasoning more apparent than as it pertains to Florida's constitutional right to bear arms-article I, section 8(a), Florida Constitution. That provision guarantees the "right of the people to keep and bear arms," "except that the manner of bearing arms may be regulated by law ." Id. (emphasis added). Surely, neither the First District nor the Respondents could argue with a straight face that Florida's right to bear arms is a nonjusticiable political question, despite it being a hot-button political issue and including the phrase "by law." Gun owners regularly challenge gun laws and courts concomitantly adjudicate those challenges as justiciable. See Norman v. State , 215 So.3d 18 (Fla. 2017). Therefore, nothing in the language of article IX, section 1(a) so much as hints at the notion that the definition of a right to education is exclusively a legislative and executive prerogative.
*159 Next, courts look to whether there are "judicially discoverable and manageable standards." Vieth , 541 U.S. at 278, 124 S.Ct. 1769 (quoting Baker , 369 U.S. at 217, 82 S.Ct. 691 ). Article IX, section 1(a) expressly includes the standard for determining the "adequate provision" for education: the public system must be "uniform, efficient, safe, secure, and high quality." Art. IX, § 1(a). One of these requirements, uniformity, we have already construed and adjudicated. Bush v. Holmes , 919 So.2d 392, 412-13 (Fla. 2006). Two of the other requirements, safe and secure, are certainly subject to judicial review-as the trial court concluded in the final order. Final Order at 19 ("The terms in Article IX relating to "safe" and "secure" are subject to judicially manageable standards.... Florida's trial courts deal with issues related to safety and security all day long."). That leaves two of the five requirements, which are the two at issue here, efficient and high quality. Both of those terms are capable of interpretation.[23] Therefore, there are clearly judicial standards to guide courts-those that the people of Florida specifically chose to include in article IX, section 1(a).
The process of interpreting and defining those terms may be somewhat challenging, but nonjusticiability is simply not the appropriate solution. Judges occasionally throw up justiciability barricades only to avoid the difficult or complex cases, taking the easy way out by using excuses to defer the decision of a case to a legislative body. But if our standard is to avoid difficult questions simply because they may implicate some attenuated political concern, then the Legislature has carte blanche to do as it pleases without any constitutional oversight or protection. The Legislature is composed of politicians; so, by definition, everything that the Legislature does is political in the abstract. Moreover, almost every statute that the Legislature passes involves appropriations to some extent. Therefore, it should be with severe caution that judges decide an entire constitutional provision is nonjusticiable on the basis that it touches upon politics or the spending of money. I understand and recognize that separation of powers is certainly a foundational principle of our system of government, art. II, § 3, Fla. Const.; however, that proposition is as much about delineating a department's proper exercise of power as it is about establishing a system of checks and balances to prevent the accumulation of power in any one branch. The Federalist No. 51, at 331 (James Madison) (R. Scigliano ed. 2000) ("In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself."). The history of our constitutional experiment is riddled with examples of courts struggling with difficult and complex questions-and providing eloquent answers-to the extent and meaning of broadly phrased constitutional protections, even when answering arguably political questions. There are far too many illustrations to list here, so a few examples must suffice.
First, courts have wrangled with the meaning of due process since the inception of this country. See, e.g. , *160 Mathews v. Eldridge , 424 U.S. 319, 332-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ; Dent v. West Virginia , 129 U.S. 114, 122-24, 9 S.Ct. 231, 32 L.Ed. 623 (1889). Well over 100 years ago, the United States Supreme Court concluded that "it may be difficult, if not impossible, to give to the terms 'due process of law' a definition which will embrace every permissible exertion of power affecting private rights." Dent , 129 U.S. at 123, 9 S.Ct. 231. Despite the impossibility of any bright-line judicial standard, here we are today still deciding the meaning and extent of guaranteed due process rights. E.g. , Jennings v. State , 43 Fla. L. Weekly S427, --- So.3d ----, 2018 WL 4784074 (Fla. Oct. 4, 2018) (concluding that a defendant's due process rights were not violated). Correspondingly, courts regularly wrestle with the rubik's cube of due process to determine the extent of constitutional protections despite those protections virtually always implicating appropriations. For instance, in Goldberg v. Kelly , 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court held that due process requires states to provide public-aid recipients with a hearing before terminating their benefits. Id. at 261-66, 90 S.Ct. 1011. Although hearings necessitate funding and welfare benefits are a politically charged issue, the Court properly decided the case on due process grounds without mention of justiciability. Thus, for as long as courts are trying to define the precisely undefinable, such as due process, they should be expected to apply express constitutional principles, like those announced in article IX, section 1(a).
Second, judges determine the meaning of equal protection, which regularly implicates political, policy, and appropriations issues without absolute or exactingly clear judicial standards. It is fitting to use Brown v. Board of Education , 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), as an example. The Court there held that segregated schools are "inherently unequal" and, therefore, violate equal protection. Id. at 495, 74 S.Ct. 686. Of course, Brown had wide-ranging effects on appropriations by Congress and state legislatures across the country. Moreover, the case settled an abhorrent political debate. But, in ordering desegregation, the Court could not set out exactingly detailed judicial standards on how the process would occur-that was left for state school officials, legislatures, and courts to sort out. Brown v. Bd. of Educ. (Brown II ), 349 U.S. 294, 299-300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).[24] The Court understood that there was no one-size-fits-all judicial standard on the most effective manner of desegregation, so it ordered state courts to supervise that process-which most certainly entailed many policy decisions-to determine compliance. Brown II , 349 U.S. at 299-300, 75 S.Ct. 753. A similar circumstance exists here. Petitioners ask this Court to review certain actions, performances, and conduct of the school system to decide whether it is within constitutional parameters. They do not ask us to make any of the myriad policy decisions that go into the operation of a school system; rather, they seek review of the system itself to determine if it meets constitutional muster. Thus, any suggestion that the express Florida constitutional right to an education is nonjusticiable cannot in my view withstand scrutiny.
Third, courts draw lines every day on unreasonable searches and seizures regardless *161 of the fact that constantly changing circumstances make a final resolution of Fourth Amendment protections with mathematical precision impossible. For example, whether interpreting privacy rights in invoices for cases of glass, Boyd v. United States , 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), or cell phone location data, Carpenter v. United States , --- U.S. ----, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018), the Supreme Court has interpreted the same words to elucidate their meaning throughout the ages in vastly different areas. Just because those standards will most assuredly change over time does not portend that legislative actions are free from judicial review. With regard to justiciability, it is also of no importance that court interpretations of the Fourth Amendment will always remain behind the cutting edge of technology. Judges will continue to interpret that language to determine the protections guaranteed for as long as our system exists. The same should be true of the express right to an education in Florida.
Finally, courts have interpreted the implicit constitutional right to marriage. In Obergefell v. Hodges , --- U.S. ----, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015), the Supreme Court held that same-sex couples have a fundamental right to marriage, which states cannot abridge. Id. at 2604-05. Despite the fact that there is no express constitutional right to marriage and Obergefell concerned a divisive political issue, the Court decided the case. Tellingly for our purposes, however, not even the various dissenting opinions there disputed the justiciability of that question. Id. at 2611-43. If implied constitutional rights are justiciable, then surely expressly stated constitutional rights with parameters are-thus article IX, section 1(a) presents a justiciable question.
The point of these examples is to simply illustrate that courts regularly define and interpret broad, principled constitutional language on politically sensitive issues, regardless of appropriations and policy concerns, even in the absence of bright-line mathematically precise standards. The instant dispute is not about whether the education system is adequate; rather, we face the threshold question of whether that issue can even be considered and ruled upon by Florida courts. Our school system may or may not be adequate, but we will never know if the Court categorically relegates the question to an unreviewable status. In my view, justiciability is an excuse here to avoid a tough case in these education adequacy challenges, rather than sound legal reasoning based on a valid separation of powers analysis. And, when the risk is that a nonjusticiability label could render nugatory our children's constitutional right to an education, dodging our duty will not suffice. A few months ago, our sister court in Minnesota succinctly summarized this issue:
Although specific determinations of educational policy are matters for the Legislature, it does not follow that the judiciary cannot adjudicate whether the Legislature has satisfied its constitutional duty under the Education Clause. Deciding that [these] claims are not justiciable would effectively hold that the judiciary cannot rule on the Legislature's noncompliance with a constitutional mandate, which would leave Education Clause claims without a remedy. Such a result is incompatible with the principle that where there is a right, there is a remedy.
Cruz-Guzman v. State , 916 N.W.2d 1, 9 (Minn. 2018).
The importance of education to the people of this State and to the State itself cannot be overstated. Education and educational *162 opportunities are not only foundational for the State of Florida but are part of the essential building blocks for a free and open society. Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 The Writings of James Madison 103 (Gaillard Hunt ed. 1910) ("Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives."). The life of a strong and vibrant republic has and always will have a direct connection to the quality of the educational status of our people.
While the substantive concept of education generally has grown to become both vast and complex, it does not always lend itself to fastidious description with absolute and complete mathematical, formal precision. The politicians do not own our government nor do they have the power to ignore specific rights placed in our Constitution by our citizens. Art. I, § 1, Fla. Const. ("All political power is inherent in the people."). The protections our citizens have demanded are merely hollow phrases of nothingness if there is no remedy or actual access to the protections listed.
For these reasons, I would conclude that the rights enshrined in article XI, section 1(a) are justiciable.
PARIENTE and QUINCE, JJ., concur.

Although there are six Baker factors, the Supreme Court places most emphasis on the first two, which are listed here. See Zivotofsky , 566 U.S. at 194-95, 132 S.Ct. 1421 ; see also Vieth v. Jubelirer , 541 U.S. 267, 278, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion).

Other courts have defined an efficient school system. E.g. , DeRolph v. State , 89 Ohio St.3d 1, 728 N.E.2d 993, 997-98 (2000) ; Neeley v. West Orange-Cove Consol. Indep. Sch. Dist. , 176 S.W.3d 746, 752-53 (Tex. 2005) ; Pauley v. Kelly , 162 W.Va. 672, 255 S.E.2d 859, 705-07 (1979). Although high quality may be more difficult to define, it is not beyond a precise definition. Contra Comm. for Educ. Rights v. Edgar , 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178, 1191-93 (1996) (holding that "high quality" cannot be judicially ascertained based on the Illinois Constitution).

In the aftermath of Brown , this Court displayed one of its most shameful moments through the treatment of Virgil Hawkins and similarly situated students. See State ex rel. Hawkins v. Bd. of Control , 83 So.2d 20 (Fla. 1955). Although any justiciability disagreement here cannot approach the foul factors at play there, it is worth noting that not even the Hawkins Court suggested that desegregation of schools was nonjusticiable. See generally id.