614 So.2d 455 (1992)
Charles Kenneth FOSTER, Appellant,
v.
STATE of Florida, Appellee.
No. 76639.
Supreme Court of Florida.
October 22, 1992.
Rehearing Denied April 1, 1993.
*457 Richard H. Burr and Steven W. Hawkins of NAACP Legal Defense and Educational Fund, Inc., New York City, and Steven L. Seliger, Quincy, for appellant.
Robert A. Butterworth, Atty. Gen., and Mark C. Menser, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Charles Kenneth Foster appeals the sentence of death imposed upon him after resentencing. He also appeals the denial of his motion for postconviction relief. Our jurisdiction is based upon article V, section 3(b)(1), Florida Constitution.
Foster was convicted of murder and sentenced to death in 1975. This Court affirmed the conviction and death sentence in Foster v. State, 369 So.2d 928, 929 (Fla.), cert. denied, 444 U.S. 885, 100 S.Ct. 178, 62 L.Ed.2d 116 (1979). The following facts are set forth in that opinion:
Anita Rogers, 20 years of age, and Gail Evans, 18 years of age, met defendant and the victim, Julian Lanier, at a bar. They knew defendant, but the victim was a stranger.
The girls, after a discussion, agreed to go to the beach or somewhere else to drink and party with the men. The victim bought whiskey and cigarettes, after which the four of them left in the victim's Winnebago camper. The victim was quite intoxicated and surrendered the driving chore to Gail. The defendant and the girls had planned for Gail to have sex with the victim and make some money. Gail parked the vehicle in a deserted area and, after some conversation concerning compensation, the victim and Gail began to disrobe.
Defendant suddenly began hitting the victim and accusing him of taking advantage of his sister. Defendant then held a knife to the victim's throat and cut his neck, causing it to bleed profusely. They dragged the victim from the trailer into the bushes where they laid him face down and covered him with pine branches and leaves. They could hear the victim breathing so defendant took a knife and cut the victim's spine.
The girls and defendant then drove off in the Winnebago and found the victim's wallet underneath a mattress. The defendant and the girls split the money *458 found in the wallet and left the vehicle parked in the parking lot of a motel.
The next morning Anita Rogers went to the Sheriff's Department and reported what had happened... .
Foster, 369 So.2d at 928-29.
The trial court denied relief on Foster's first postconviction motion, and this Court affirmed. Foster v. State, 400 So.2d 1 (Fla. 1981). In addition, federal courts denied Foster relief on two federal habeas petitions. Foster v. Dugger, 823 F.2d 402 (11th Cir.1987), cert. denied, 487 U.S. 1241, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988); Foster v. Strickland, 707 F.2d 1339 (11th Cir.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984). In Foster v. State, 518 So.2d 901 (Fla. 1987), cert. denied, 487 U.S. 1240, 108 S.Ct. 2914, 101 L.Ed.2d 945 (1988), we affirmed the denial of Foster's second postconviction motion, but we granted his habeas petition and ordered resentencing due to Hitchcock[1] error.
On remand for resentencing, Foster filed a 3.850 motion. The trial court refused to continue the resentencing hearing until resolution of the 3.850 motion. Following the jury's 8-4 recommendation, the trial judge imposed the death penalty.[2] Thereafter, the court summarily denied the 3.850 motion without an evidentiary hearing.
We address first Foster's claim that the trial court erred in denying his 3.850 motion without an evidentiary hearing. Foster's motion alleged a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and ineffective assistance of trial counsel. The Brady claim centers around Foster's allegation that the state failed to disclose that it offered Gail Evans and Anita Rogers deals in exchange for their testimony at trial. Although the court did not hold an evidentiary hearing on this claim, Foster presented the evidence on which he relies to support the claim at a hearing on his motion to preclude admission of Rogers' and Evans' 1975 trial testimony. Rogers' ex-husband testified that several years after the trial, Rogers told him that the state had promised not to prosecute her in return for her testimony.
In his claim of ineffective assistance of counsel, Foster asserts that trial counsel failed to discover that Rogers and Evans believed that Foster was "crazy" at the time of the attack. Had counsel been aware of this, Foster reasons, he would have pursued mental health defenses that would have precluded a finding of premeditated murder. He also alleges that counsel failed to discover, or alternatively the state failed to disclose, that Foster cut off the victim's penis during the course of the attack.
This is Foster's third postconviction motion. A successive motion may be dismissed if it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the failure to raise those issues in a prior motion constitutes an abuse of process. Fla.R.Crim.P. 3.850. To overcome this bar, a movant must allege that the grounds asserted were not known and could not have been known to him at the time of the earlier motion. Christopher v. State, 489 So.2d 22, 24 (Fla. 1986). The movant must show justification for the failure to raise the issues in the prior motions. Id.
Foster alleged ineffective assistance of trial counsel in his initial postconviction motion. We rejected that claim on the merits.[3]Foster, 400 So.2d 1. Foster has *459 not previously raised a Brady claim. Although he alleges the discovery of new facts in order to avoid application of the abuse of process doctrine, he has failed to demonstrate or even allege that the facts could not have been known to him at the time of his earlier motions. We note that Foster has been represented by the same counsel since at least the time of the appeal of the denial of his first postconviction motion in 1981. Having failed to show any justification for his failure to raise the present claims in his earlier postconviction motions, the instant motion constitutes an abuse of process. Spaziano v. State, 545 So.2d 843 (Fla. 1989); Tafero v. State, 524 So.2d 987, 988 (Fla. 1987); Booker v. State, 503 So.2d 888, 889 (Fla. 1987); Christopher v. State, 489 So.2d at 25.[4]
Even if there were no procedural bar, Foster's claim would not prevail. At trial, Foster made a witness stand confession in which he stated:
I reckon I'll just cop out. I have done it, killed him deader than hell. I ain't going to set up here, I am under oath and I ain't going to tell no fucking lies. I will ask the Court to excuse my language. I am the one that done it. They didn't have a damn thing to do with it. It was premeditated and I intended to kill him. I would have killed him if he hadn't had no money and I know I never told you about it, but I killed him.
369 So.2d at 929. In light of Foster's confession, there is no reasonable probability that the outcome of the trial would have been different had any of the evidence Foster now asserts was not disclosed or not discovered been presented. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (one alleging ineffective assistance of counsel must show deficient performance and prejudice); Hegwood v. State, 575 So.2d 170, 172 (Fla. 1991) (to establish Brady violation, one must prove that had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different).
Gail Evans personally testified at the resentencing hearing. However, over Foster's objection, the court allowed the state to introduce the testimony of Anita Rogers from the 1975 trial. Foster claims that the court failed to conduct an appropriate inquiry into Rogers' unavailability before admitting her prior trial testimony and that the use of her testimony abridged his right of confrontation.
We find no error in the trial court's determination that Rogers was unavailable. According to the assistant state attorney, in 1989, in an effort to find Rogers, investigators from that office attempted to locate her ex-husband. They were unsuccessful. In late May of 1990, shortly before the resentencing proceeding, defense counsel gave the state attorney Rogers' address and telephone number in Tampa. The state attorney called the number several times. He left messages on an answering machine as well as with a man who answered the telephone and said that he was Rogers' former brother-in-law. Rogers never returned the phone calls. At the state attorney's request, the Hillsborough County Sheriff's Department attempted to subpoena Rogers but were unsuccessful. A deputy attempting to serve the subpoena was advised by someone at Rogers' address that she was out of town at an unknown location. This was sufficient to establish Rogers' unavailability for purposes of the resentencing hearing.
Further, Foster's right of confrontation was not abridged. The court admitted Rogers' cross-examination in addition to her direct testimony. The court also allowed Foster to rebut Rogers' testimony with other witnesses. Under these facts we find no error in the admission of Rogers' trial testimony. See Hitchcock v. State, 578 So.2d 685, 690 (Fla. 1990) (upholding the admission in resentencing proceeding *460 of trial transcript where the state was unable to locate the witness and the court admitted the witness's entire trial testimony, including cross examination), cert. denied, ___ U.S. ___, 112 S.Ct. 311, 116 L.Ed.2d 254 (1991).
At resentencing, Foster sought to impeach Rogers' trial testimony by introducing evidence that she had been convicted of false reporting of a crime and grand larceny in 1989. The trial court excluded evidence of the convictions, apparently finding that the 1989 convictions were not probative of Rogers' truth and veracity at the time of the 1975 testimony. We find no abuse of discretion in the exclusion of this evidence. Teffeteller v. State, 495 So.2d 744, 745 (Fla. 1986). ("[I]t is within the sound discretion of the trial court during resentencing proceedings to allow the jury to hear or see probative evidence which will aid it in understanding the facts of the case in order that it may render an appropriate advisory sentence.").
One day before the resentencing proceeding was scheduled to begin, Foster filed a motion pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, asking the court to require the state to disclose Rogers' and Evans' mental health records. The state attorney objected, indicating the state did not have the records and had no better access to the records than did defense counsel. Foster challenges the trial court's denial of his motion.
Foster has not shown a Brady violation. The state denied having the records. Further, Foster made no showing that he could not have obtained this evidence with reasonable diligence. See Hegwood v. State, 575 So.2d 170, 172. Foster cites no case for his proposition that it was the state's obligation, rather than his own, to obtain such records.
Foster also claims that the trial court erred in finding the murder to be especially heinous, atrocious, or cruel[5] and cold, calculated and premeditated.[6] The court relied on the following evidence to find the aggravating factor of especially heinous, atrocious, or cruel:
The circumstances of the killing indicate a consciousless and pitiless regard for the victim's life and was unnecessarily tortuous to the victim, Julian Franklin Lanier. The victim did not die an instantaneous type of death. The victim was severely beaten prior to death. His nose was fractured, his face was severely bruised and his eyes were swollen shut from edema from hemorrhage and swelling resulting from the beating. After beating the victim, the defendant took out a knife and told the victim "I'm going to kill you; I'm going to kill you." There is evidence that one of the girls present asked the defendant not to do it. The defendant then proceeded to stab the victim in the throat. There is evidence of a defensive wound to the victim's hand which indicates the victim attempted to fend off the knife as the defendant stabbed him in the throat.
After stabbing the victim in the throat, the defendant grabbed the victim by his testicles, or genitals, in order to move the victim outside. The victim groaned or moaned and the defendant stabbed the victim in the throat a second time. This second wound cut the victim's internal and external jugular veins. The victim could have lived from 20 to 30 minutes after this wound was inflicted.
Neither of these wounds to the neck severed the victim's vocal cords. There is evidence that the victim asked the defendant not to do it again before he was stabbed a second time.
After the second stab wound, the victim was dragged into the woods where he was covered with bushes. The marks on the victim's body indicated to the medical examiner, that the victim was either alive or dead a very short time before he was being dragged. It is consistent with what happened next to assume the victim was alive.
After the victim was covered in the woods, one of the girls accompanying the *461 defendant reported to the defendant that she could hear the victim breathing. The defendant then went back to the victim, who was lying face down, uncovered him and cut the victim's spine with a knife. As described by one witness, there was no air coming from the body of the victim after she heard "the cracking" of the spine. The medical examiner indicated the victim could have lived 3 to 5 minutes after his spinal cord was severed.
This evidence establishes that the murder was especially heinous, atrocious, or cruel.
The trial court relied on these same facts to find the murder to be cold, calculated, and premeditated. In addition, the court relied on Foster's witness stand confession and Anita Rogers' trial testimony. Rogers testified that prior to the attack, Foster asked her to exchange class rings with him. Foster's ring bore the initial "K." He told Rogers that he wanted to switch rings because his ring would have left "K" impressions on the victim, thus identifying him as the perpetrator. As the prosecutor argued to the jury, if Foster had not intended to kill the victim, it would have made no difference if there were "K" impressions on the victim because he would have been alive to identify Foster. These facts establish the existence of a careful plan or prearranged design to kill.[7]Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988).
Next, Foster claims that the jury charge and the prosecutor's closing argument limited the jury's consideration of mitigating evidence in violation of Cheshire v. State, 568 So.2d 908 (Fla. 1990) (state may not restrict consideration of mitigating circumstances solely to "extreme" emotional disturbances; any emotional disturbance relevant to the crime must be considered). The court gave the following special instruction:
Among the mitigating circumstances which you may consider are the following. First, the crime for which the defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance.
Second, that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
Third, that the defendant had an abusive family background.
Fourth, the defendant's poverty.
Fifth, the physical illness of the defendant.
Sixth, the defendant's love for and love by his family.
Seventh, any alcohol or drug addiction of the defendant.
Eighth, a troubled personal life including depression and frustration.
Ninth, physical injuries suffered by the defendant.
Tenth, the defendant's lack of childhood development.
Eleventh, the effect of death of loved ones on the defendant.
Twelfth, the learning disability suffered by the defendant.
Thirteenth, the defendant's potential for positive sustained human relationships.
Fourteenth, any other aspect of the defendant's character or record and any other circumstance of the crime or offense.
Foster argues that this instruction created a substantial risk that the jury believed that they could only find the mental health evidence to be mitigating if it rose to the statutory level. In addition to being given the quoted instruction, the jury was informed that it must consider any aspect of *462 the defendant's character and background or any other circumstance presented in mitigation and that there was no limitation on the mitigating factors which could be considered. Viewing the instructions as a whole, we find no reasonable likelihood that the jurors understood the instruction to preclude them from considering any relevant evidence. Robinson v. State, 574 So.2d 108, 111 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 131, 116 L.Ed.2d 99 (1991). Further, in closing argument, defense counsel discussed the mental health mitigation in detail. He argued that the evidence rose to the statutory level but nevertheless argued that Foster was clearly under an emotional disturbance even if it did not meet the level required by statute. Accordingly, we reject this claim.
Next, Foster asserts that the court erred in refusing to give certain jury instructions. The rejected instructions deal with the following subjects: (1) the determination of the aggravating factor of especially, heinous, atrocious, or cruel; (2) the determination of the aggravating factor of cold, calculated, and premeditated; and (3) the jury's pardon power. He also alleges that the jury instructions on these two aggravating circumstances were inadequate.
The instruction given on heinous, atrocious, and cruel was the same as the one held to be inadequate in Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990). Therefore, the court erred in failing to give Foster's requested instruction which contained an expanded definition of that aggravating factor. We conclude, however, that the error was harmless. As may be seen from that portion of the trial judge's order previously quoted, Foster's killing of Julian Lanier was especially heinous, atrocious, and cruel by any standard. The jury could not have been misled by the inadequate instruction. We further hold that the court did not abuse its discretion in refusing to give the other jury instructions which Foster had requested.
Next, Foster asserts that the court erred in failing to strike three venire members for cause. He argues that: (1) Carol Ann Pope should have been excused because she indicated bias against persons who have had numerous appeals; (2) Thomas Martin should have been excused because he went to junior high school with Foster and the two of them "had a couple of fights"; (3) Marion Pelland should have been excused because she was predisposed toward imposing the death penalty for all premeditated murders. Foster exercised peremptory challenges to excuse these three jurors.
"The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court." Lusk v. State, 446 So.2d 1038, 1041 (Fla.), cert. denied, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984). The record does not support Foster's allegations regarding these potential jurors. We have reviewed the transcript of jury selection and do not find any basis for excusing these jurors for cause.
Next, Foster claims that the trial court improperly excused venire member Deluzain for cause in violation of the principles established in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).
A juror may be excluded in a death case if his views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). The record evinces Deluzain's inability to set aside her own beliefs in deference to the law. Randolph v. State, 562 So.2d 331, 337 (Fla.), cert. denied, 498 U.S. 992, 111 S.Ct. 538, 112 L.Ed.2d 548 (1990). She said that she did not believe that she could vote to impose the death penalty in any situation other than a murder within a prison setting. When asked whether she could set aside her feelings against the death penalty if the murder were sufficiently aggravated, she responded that she was not sure that *463 she could. The trial court did not abuse its discretion in excusing her for cause.
Further, Foster challenges the circuit court's refusal to allow him to show that the use of the death penalty in Bay County, Florida, is racially discriminatory. Foster moved to preclude the state attorney's office from seeking the death penalty in his case based on his assertion that the Bay County State Attorney's Office pursued prosecution much more vigorously and fully in cases involving white victims than in cases involving black victims.
In support of his claim, Foster proffered a study conducted by his counsel of some of the murder/homicide cases prosecuted by the Bay County State Attorney's Office from 1975 to 1987. Analyzing the raw numbers collected, Foster concluded that defendants whose victims were white were 4 times more likely to be charged with first-degree murder than defendants whose victims were black. Of those defendants charged with first-degree murder, white-victim defendants were 6 times more likely to go to trial. Of those defendants who went to trial, white-victim defendants were 26 times more likely to be convicted of first-degree murder. The court refused to hold an evidentiary hearing, finding that the alleged facts did not make out a prima facie claim of discrimination.
The United States Supreme Court rejected a similar challenge in McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). McCleskey claimed that the imposition of Georgia's death penalty was racially discriminatory in violation of the Eighth and Fourteenth Amendments. He relied on a statistical study, the Baldus study, which purported to show a disparity in the imposition of Georgia's death penalty based on the race of the victim and the race of the defendant. The raw figures collected by Professor Baldus indicated that defendants charged with killing white victims received the death penalty in 11% of the cases, but defendants charged with killing blacks received the death penalty in only 1% of the cases. Baldus further found that the death penalty was assessed in 22% of the cases involving black defendants and white victims; 8% of the cases involving white defendants and white victims; and 3% of cases involving white defendants and black victims. The figures indicated that prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims; 32% of the cases involving white defendants and white victims; 15% of the cases involving black defendants and black victims; and 19% of the cases involving white defendants and black victims.
After accounting for numerous variables that could have explained the disparities on other than racial grounds, the Baldus study found that defendants charged with killing white victims were 4.3 times as likely to receive a death sentence as defendants charged with killing black victims. Black defendants were 1.1 times as likely to receive a death sentence as other defendants. As a black defendant who killed a white victim, McCleskey argued that the Baldus study demonstrated that he was discriminated against because of his race and the race of his victim.
The Court held that McCleskey "must prove that the decisionmakers in his case acted with discriminatory purpose." McCleskey, 481 U.S. at 292, 107 S.Ct. at 1767. The Court rejected McCleskey's claim because he offered no evidence specific to his own case to support an inference that racial considerations played a part in his sentence. The Court found the Baldus study to be insufficient to support an inference that the decisionmakers in McCleskey's case acted with purposeful discrimination.
Foster's claim suffers from the same defect. He has offered nothing to suggest that the state attorney's office acted with purposeful discrimination in seeking the death penalty in his case. See Harris v. Pulley, 885 F.2d 1354, 1375 (9th Cir.1988), cert. denied, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990); Byrd v. Armontrout, 880 F.2d 1, 10 (8th Cir.1989), cert. denied, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990); Kelly v. Lynaugh, 862 F.2d 1126, 1135 (5th Cir.1988), cert. denied, 492 U.S. 925, 109 S.Ct. 3263, 106 L.Ed.2d *464 608 (1989). The trial court was not required to hold an evidentiary hearing on this claim. Harris, 885 F.2d at 1375 (defendant not entitled to evidentiary hearing where he offered no proof that decisionmakers in his case acted with discriminatory purpose).
Foster argues that McCleskey does not foreclose his challenge because his evidence focuses solely on the practices of one prosecutor's office, whereas the Baldus study consisted of generalized statistics covering every aspect of Georgia's death penalty scheme. The McCleskey Court questioned whether a state "policy" of discrimination could be deduced by studying the combined effects of hundreds of decisionmakers.
The Court in McCleskey held that:
[T]he policy considerations behind a prosecutor's traditionally "wide discretion" suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties "often years after they were made." Moreover, absent far stronger proof, it is unnecessary to seek such a rebuttal, because a legitimate and unchallenged explanation for the decision is apparent from the record: McCleskey committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty.
... . Implementation of these laws necessarily requires discretionary judgments. Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused.
McCleskey, 481 U.S. at 296-97, 107 S.Ct. at 1769-70 (citations omitted).
The figures proffered by Foster do not constitute "exceptionally clear proof" of discrimination. See Harris v. Pulley, 885 F.2d at 1375. Foster's figures do not account for any of the myriad of nonracial variables that could explain the disparity. See McCleskey, 481 U.S. at 295, n. 15, 107 S.Ct. at 1769, n. 15 ("decisions whether to prosecute and what to charge necessarily are individualized and involve infinite factual variations... ."). Even assuming the validity of Foster's study,[8] the raw numbers analyzed by Foster do not show a significantly greater disparity than figures proffered by the Baldus study which had taken into account numerous nonracial variables.[9]
Finally, Foster claims that the trial court's sentencing order fails to evaluate the proposed mitigating factors as required by Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). In discussing the manner in which the trial court should consider mitigating circumstances in a case in which the state seeks the death penalty, we said:
[T]he trial court's first task in reaching its conclusions is to consider whether the facts alleged in mitigation are supported by the evidence. After the factual finding has been made, the court then must determine whether the established facts are of a kind capable of mitigating the defendant's punishment, i.e., factors that, in fairness or in the totality of the defendant's life or character may be considered as extenuating or reducing the degree of moral culpability for the crime committed. If such factors exist in the record at the time of sentencing, the sentencer must determine whether they are of sufficient weight to counterbalance the aggravating factors.
Id. at 534.
In addressing mitigation in the sentencing order, the trial court first listed thirteen mitigating factors that Foster had offered for consideration. The court then stated:

*465 The Court must note that there is a conflict in evidence on the questions of whether the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance and the capacity of the defendant to appreciate the criminality of his conduct to the requirements of law was substantially impaired (emphasis supplied).
After discussing the conflict in the evidence, the court then concluded:
The Court will therefore consider this conflict in the weight to be given these two factors in relating to the aggravating circumstances.
The Court has considered the evidence presented in support of each of these mitigating factors and, in weighing these factors against the aggravating factors, finds that the aggravating circumstances outweigh the mitigating circumstances in this case.
While it is evident that the court considered the mitigating circumstances, we cannot tell whether the court determined whether either of the two statutory mental mitigating circumstances existed. In fact, we are unable to say whether the court found any of the mitigating circumstances to exist or what weight was given to them. Unlike Rogers, we cannot say that this defect in the sentencing order was harmless error.[10]
Accordingly, we vacate the sentence of death and remand the case for the trial judge to enter a new sentencing order following the dictates of Rogers and Campbell v. State, 571 So.2d 415 (Fla. 1990).[11]See Lucas v. State, 568 So.2d 18 (Fla. 1990). We affirm the denial of Foster's motion for postconviction relief.
It is so ordered.
OVERTON, McDONALD, GRIMES and HARDING, JJ., concur.
BARKETT, C.J., concurs in part and dissents in part with an opinion, in which SHAW and KOGAN, JJ., concur.
KOGAN, J., concurs in part and dissents in part with an opinion.
BARKETT, Chief Justice, concurring in part, dissenting in part.
I concur in the majority's resolution of all the issues except for Foster's claim regarding the discriminatory use of the death penalty in Bay County, Florida.
The majority concludes that Foster "has offered nothing to suggest that the state attorney's office acted with purposeful discrimination in seeking the death penalty in his case." Majority op. at 463. My disagreement is not so much with that statement as with a standard that requires showing something that is virtually impossible to show: purposeful discrimination. McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).
In McCleskey, the U.S. Supreme Court dismissed McCleskey's analogous federal equal protection claims, holding that a defendant must establish both "the existence of purposeful discrimination" and a "discriminatory effect" on that particular defendant. Id. at 292, 107 S.Ct. at 1767. I agree that under the federal precedent McCleskey would control this case.
Foster, however, claims a violation of the Equal Protection Clause of the Florida Constitution. Art. I, § 2, Fla. Const. Despite the principles adopted in Traylor v. State, 596 So.2d 957 (Fla. 1992), establishing the primacy of the Florida Constitution, the majority completely ignores Foster's state constitutional challenge. I believe that Foster's claim deserves full consideration.
Despite earlier transgressions,[12] Florida in recent years has clearly established its *466 commitment to equality of treatment in the courts. See, e.g., Report and Recommendations of the Florida Supreme Court Racial and Ethnic Bias Study Commission (1990 & 1991); The Florida Supreme Court Gender Bias Study Commission Final Report (1990). Indeed, while the U.S. Supreme Court was still requiring a defendant to meet the impossible burden of proving that discriminatory jury selection practices were employed systematically in a number of similar cases or contexts, Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), this Court took the lead in State v. Neil, 457 So.2d 481 (Fla. 1984), clarified by State v. Castillo, 486 So.2d 565 (1986), and established guidelines under the Florida Constitution to guard against the racially discriminatory use of peremptory challenges.[13] The U.S. Supreme Court followed suit two years later in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), when it overruled the Swain standard and acknowledged that it imposed a "crippling burden of proof" that rendered a prosecutor's peremptory challenges largely immune from constitutional scrutiny. Id. at 92-93, 106 S.Ct. at 1720-21. The Court found that a prosecutor's use of peremptory challenges is subject to the constraints of the Equal Protection Clause when there is some basis for believing that the challenges are used in a racially discriminatory manner.[14]
The U.S. Supreme Court in Batson recognized the invidious nature of discrimination. Id. at 93-96, 106 S.Ct. at 1721-23. Justice Marshall, in a concurring opinion, noted that discrimination is not often blatantly expressed, and in many cases it is subliminal:
A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is `sullen,' or `distant,' a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported.
Id. at 106, 106 S.Ct. at 1728 (Marshall, J., concurring). Studies of unconscious racism have shown that the perpetrator does not feel particularly punitive toward minorities; rather, he or she wants to remain distant and is less likely to feel empathy because of the distance. Sheri Lynn Johnson, Comment, Unconscious Racism and the Criminal Law, 73 Cornell L.Rev. 1016, 1020 n. 27 (1988). While society has largely rejected blatant stereotypes and overt discrimination, more subtle forms of racism are increasing: "A burgeoning literature documents the rise of the `aversive' racist, a person whose ambivalent racial attitudes leads him or her to deny his or her prejudice and express it indirectly, covertly, and often unconsciously." Id. at 1027-28 (footnotes omitted).
Discrimination, whether conscious or unconscious, cannot be permitted in Florida courts. As important as it is to ensure a jury selection process free from racial discrimination, it is infinitely more important to ensure that the State is not imposing the ultimate penalty of death in a racially discriminatory manner. The U.S. Supreme Court may eventually recognize that the burden imposed by McCleskey is as insurmountable as that presented by Swain. In the meantime, defendants such as Foster have no chance of proving that application of the death penalty in a particular jurisdiction is racially discriminatory, no matter how convincing their evidence.[15]
*467 Assuming, for the sake of argument, that unconscious discrimination exists, how can it be proven? As the U.S. Supreme Court recognized in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977), "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." In cases involving jury pools, for example, the U.S. Supreme Court has recognized that a strict application of the purposeful discrimination standard generally required under the Equal Protection Clause is inequitable. See Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976) (explaining the standard applicable to jury cases); Castaneda v. Partida, 430 U.S. 482, 493-96, 97 S.Ct. 1272, 1279-81, 51 L.Ed.2d 498 (1977). A prima facie case of intentional discrimination can be established by showing that representation of a minority in the jury venire falls below the population as a whole or by demonstrating that criteria are subjective and lead to exclusion or underinclusion. Once the prima facie case has been established, the burden then shifts to the State to rebut that case. Partida, 430 U.S. at 494-97, 97 S.Ct. at 1280-82; see also Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). This standard amounts to something considerably less than purposeful and deliberate discrimination; indeed, the Court in these cases has expressed a willingness to consider discriminatory impact, as evidenced by statistics, that cannot be traced to blatant or overt discrimination.
I believe that statistical evidence of discrimination in capital sentencing decisions should similarly establish a violation of article I, section 2 of the Florida Constitution. "Statistical" evidence should be construed broadly to include not only historical analysis of the disposition of first-degree murder cases in a particular jurisdiction, but also other information that could suggest discrimination, such as the resources devoted to the prosecution of cases involving white victims as contrasted to those involving minority victims, and the general conduct of a state attorney's office, including hiring practices and the use of racial epithets and jokes. When racial bias, whether conscious or unconscious, exists in an environment where decisions about seeking the death penalty are made, all aspects of that bias should be available for evaluation by a court in reviewing evidence of discrimination.
In crafting a standard for proving racial discrimination in death penalty decisionmaking under the Florida Constitution, it is appropriate to borrow from the Neil and Slappy peremptory challenge line of cases, which gives the trial court discretion to determine whether a prima facie case has been established. See, e.g., Neil; Slappy; Wright v. State, 586 So.2d 1024, 1027-28 (Fla. 1991); Reed v. State, 560 So.2d 203, 206 (Fla.), cert. denied, 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990). As in the area of peremptory challenges, a bright line test for determining whether racial discrimination in the decision to seek the death penalty has occurred would be counterproductive. See Slappy, 522 So.2d at 21-22. Racial discrimination in the capital sentencing process should be evaluated as a whole, and it is impossible to anticipate all of the circumstances in which it might be manifested. The trial court is in the best position to evaluate whether a party *468 has demonstrated sufficient evidence of discrimination to warrant an inquiry.
I suggest the following standard: A party asserting racial discrimination in the State's decision to seek the death penalty should make a timely objection and demonstrate on the record that the discrimination exists and that there is a strong likelihood it has influenced the State to seek the death penalty. Such discrimination conceivably could be based on the race of the victim or on the race of the defendant. Once the trial court determines that the initial burden has been met by the defendant, the burden then shifts to the State to show that the practices in question are not racially motivated. If the trial court determines that the State does not meet that burden, the State then is prohibited from seeking the death penalty in that case.
Accordingly, because the majority has applied a federal constitutional standard in Foster's case that is impossible to meet and has missed the opportunity to craft a state constitutional standard such as that discussed above, I dissent from that portion of the opinion.
SHAW and KOGAN, JJ., concur.
KOGAN, Justice, concurring in part and dissenting in part.
I concur in the opinion of Chief Justice Barkett with the exception that I do not believe the aggravating factor of cold, calculated premeditation was proved beyond a reasonable doubt.
NOTES
[1] Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).
[2] The trial court found three aggravating circumstances: (1) the murder was committed during the course of a robbery; (2) the murder was cold, calculated, and premeditated; and (3) the murder was especially heinous, atrocious, or cruel. Foster offered thirteen mitigating circumstances. The trial court found that the mitigation did not outweigh the aggravating circumstances.
[3] In addition, we note that Foster raised ineffective assistance of counsel claims in his two federal habeas petitions. The claims were denied after evidentiary hearing and the denials were affirmed on appeal. Foster v. Dugger, 823 F.2d 402 (11th Cir.1987), cert. denied, 487 U.S. 1241, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988); Foster v. Strickland, 707 F.2d 1339 (11th Cir.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984).
[4] In addition, we note that the motion was filed outside of the limitations period established by rule 3.850. The motion fails to allege that the facts upon which his claims are based "could not have been ascertained by the exercise of due diligence." Fla.R.Crim.P. 3.850.
[5] § 921.141(5)(h), Fla. Stat. (1989).
[6] § 921.141(5)(i), Fla. Stat. (1989).
[7] Foster also contends that the application of the cold, calculated, and premeditated aggravating factor to his crime violates the Ex Post Facto Clause because the factor did not exist at the time of this crime. We have repeatedly rejected this claim. See Sireci v. State, 587 So.2d 450, 454 (Fla. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1500, 117 L.Ed.2d 639 (1992); Zeigler v. State, 580 So.2d 127 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 390, 116 L.Ed.2d 340 (1991); Combs v. State, 403 So.2d 418, 421 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 862 (Fla. 1982).
[8] The weight to be given to the results of such a small statistical sample as this is questionable. See McCleskey, 481 U.S. at 295, n. 15, 107 S.Ct. at 1768, n. 15.
[9] The figures indicating that of the defendants who went to trial, white-victim defendants were 26 times more likely to be convicted of first-degree murder than were black-victim defendants cannot be attributed to a decision by the Bay County State Attorney's Office and thus are not relevant here.
[10] In view of our disposition of this issue, we do not address Foster's argument with respect to proportionality.
[11] While Campbell did not become final until after the original sentencing order was entered, its additional requirements will obviously be applicable to any new sentencing order.
[12] See, e.g., State ex rel. Hawkins v. Board of Control, 93 So.2d 354 (Fla.), cert. denied, 355 U.S. 839, 78 S.Ct. 20, 2 L.Ed.2d 49 (1957); State ex rel. Hawkins v. Board of Control, 83 So.2d 20 (Fla. 1955), cert. denied, 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486 (1956).
[13] See also State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988) (holding that any doubt as to whether the complaining party has met its initial burden should be resolved in that party's favor).
[14] The U.S. Supreme Court recently held that the Equal Protection Clause also prohibits a criminal defendant from engaging in purposeful discrimination on the basis of race in the exercise of peremptory challenges. Georgia v. McCollum, ___ U.S. ___, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). This Court held in Neil that both the State and the defense may challenge the allegedly improper use of peremptories. 457 So.2d at 487.
[15] In this case, Foster presented statistical evidence showing that even though blacks constituted 40% of the murder victims in Bay County cases between 1975 and 1987, all 17 death sentences that were imposed were for homicides involving white victims. Additionally, the study produced by Foster concluded that defendants whose victims were white were four times more likely to be charged with first-degree murder than defendants whose victims were black. Of those defendants charged with first-degree murder, white-victim defendants were six times more likely to go to trial, and of those defendants who went to trial, white-victim defendants were 26 more times likely to be convicted of first-degree murder. Other studies also suggest that discrimination may be resulting in harsher penalties for those who kill whites. See, e.g., Bob Levenson & Debbie Salamone, Prosecutors See Death Penalty in Black and White, The Orlando Sentinel, May 24, 1992, at A1 (analyzing 283 first-degree murder cases prosecuted from Jan. 1, 1986, through Sept. 30, 1991, in Orange, Osceola, Seminole, Brevard, Lake, and Volusia counties, and finding that prosecutors sought the death penalty 27% of the time when white victims were involved and only 14% of the time when minority victims were involved).