694 So.2d 708 (1997)
Keydrick JORDAN, Appellant,
v.
STATE of Florida, Appellee.
No. 84252.
Supreme Court of Florida.
April 17, 1997.
Rehearing Denied May 27, 1997.
*709 James B. Gibson, Public Defender and Christopher S. Quarles, Assistant Public Defender, Chief, Capital Appeals, Seventh Judicial Circuit, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General and Mark S. Dunn, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Keydrick Jordan. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Jordan's convictions for first-degree murder and attempted robbery. We vacate, however, Jordan's sentence of death and remand for a new sentencing proceeding in light of penalty-phase testimony that was clearly improper and unfairly prejudicial.

Facts
The record reflects the following.
*710 Ann Mintner was killed on August 8, 1992, after being shot six times. Her death was officially caused by massive hemorrhages in both the chest and abdominal cavities.
The shooting occurred near Lake Davis in Orlando. Mintner was walking around the lake with her friend, Mary Rosensweig, on that particular August morning. When Mintner realized that she was carrying her change purse, she returned to her car to put the purse away. Rosensweig kept walking. When Rosensweig looked back, she saw a black male near Mintner. She heard the black male instruct Mintner to turn over her key. As Mintner ran toward Rosensweig, shots were fired. Mintner fell. She was on the ground as the last shot was fired. There was testimony that four of the six shots entered through Mintner's back.
A bicycle found at the crime scene contained thirty-five fingerprints. The prints belonged to Jordan and Sam Tory and evidence was presented that the bicycle was owned by Jordan and Tory. The night before the murder, Jordan and Tory had worked on the bicycle at the home of Vicki Meyers. Tory was Meyers' uncle. Jordan spent the night of August 7, 1992, at Meyers' home and left early the next morning. He told Meyers that he was going to "rob someone."
When Tory met with Jordan on August 9, 1992, Jordan revealed that that he had "popped someone." Later, when Tory saw his bicycle on television, he called Crime Line and reported Jordan. He received a $1000 reward.
On August 11, 1992, Jordan was accompanied to the Orlando Police Department. Jordan initially denied knowledge of the Mintner murder. Later, however, Jordan admitted involvement in the crime. He claimed that Tory was also involved. Jordan, though, acknowledged that he held the gun to Mintner's head. When Mintner moved away, Jordan said, the gun went off accidentally. There was testimony from a firearms expert indicating that the trigger on Jordan's gun would have to be pulled each time the gun was fired.
Jordan was indicted and tried for firstdegree murder and attempted armed robbery. The jury found Jordan guilty of both counts in the indictment and then recommended the death sentence by a margin of eight to four.
The trial judge imposed the death penalty after finding that four statutory aggravating factors were proven: (1) Jordan's crime was committed while he was placed on community control;[1] (2) Jordan had previously been convicted of a felony involving the use or threat of violence to the person;[2] (3) the capital felony was committed while Jordan was committing a robbery;[3] and (4) the capital felony was committed for pecuniary gain.[4] The trial judge expressly noted that he weighed factors (3) and (4) as a single aggravator.
The judge, in evaluating the mitigation, considered three statutory mitigators: (1) the crime was committed while Jordan was under extreme mental or emotional distress;[5] (2) Jordan's ability to understand the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired;[6] and (3) the chronological and mental age of Jordan.[7] The trial judge found that the second and third mitigators existed. He refused, however, to find the existence of the first mitigator.
The judge also evaluated nonstatutory mitigation. Jordan asked the judge to consider forty-eight separate mitigating circumstances. The trial judge addressed these circumstances by grouping like factors together and then concluded that the aggravation *711 outweighed the mitigation and imposed the sentence of death.
Jordan raises a total of ten issues on direct appeal. Six of these issues are preliminary or guilt-phase claims.

Guilt Phase
First, Jordan argues that the he was improperly prevented from demonstrating that the prosecutor had racist motives in seeking the death penalty in this case. The claim stems from the fact that Jordan was charged with the first-degree murders of two women. Both of the victims were elderly. One victim (Thelma Reed) was black and the other victim (Mintner) was white. Jordan argues that the prosecutor chose to pursue the death penalty in the Mintner case based, at least in part, on racist motives. The trial court, in an abundance of caution, ordered limited discovery. The State, strongly opposed to such discovery, sought certiorari review of the discovery order from the Fifth District Court of Appeal. The petition for writ of certiorari was granted and the district court quashed the discovery order. State v. Jordan, 630 So.2d 1171 (Fla. 5th DCA 1993). Jordan did not seek review of that decision in this Court. The State argues that this issue is procedurally barred because Jordan failed to seek review of the district court ruling. While a procedural bar may seem appropriate, we note that this Court, in similar situations, has previously reviewed rulings despite those rulings having become the law of the case. Preston v. State, 444 So.2d 939, 942 (Fla.1984). In view of the nature of the punishment imposed in this case, we will address the merits of the claim. Despite the discovery order being quashed, the trial judge proceeded to an evidentiary hearing on Jordan's motion to disallow the death penalty. The motion was denied.
In Foster v. State, 614 So.2d 455 (Fla. 1992), we addressed a similar claim of prosecutorial discrimination in the pursuit of the death penalty. We ruled that the evidence presented by Foster did not constitute the exceptionally clear proof of prosecutorial discrimination necessary to find an abuse of prosecutorial discretion. Id. at 464. In that case, Justice Barkett dissented in part. She suggested that this Court adopt a standard under our state constitution different from the federal standard relied upon by the majority. Id. at 468. We need not reexamine the differences between the federal standard and Justice Barkett's proposal because the trial judge explicitly found:
Because of the unique circumstances of this case I proceeded to an evidentiary hearing, even though I find that the showing required by the majority in Foster has not been met. But because of the unique circumstances of having two first-degree murder cases pending simultaneously [,] one with a black victim and one with a white victim, I felt it was prudent to create a record and proceed to an evidentiary hearing. But I do affirmatively find that the threshold required by the majority has not been met.
In considering the position stated by Justice Barkett, I find that the threshold she suggested has not been met either. There is no competent evidence here of a pattern of racism supported by statistics which meet evidentiary standards.
....
So I find that neither standard set forth by, neither prong set forth by Justice Barkett has been met here even if I were to decide to consider the formula put forth in the dissent in this case.
....
It's my finding that the State Attorney's Office was not racially motivated but the decision making here was proper, proper tactics and is well supported by the record. In offering the opportunity to the State Attorney's Office, I see it as offering an opportunity to make that record. And the State Attorney's Office has repeatedly refused to do that. I think that tactic is short-sighted.
It is clear that the trial judge was simply developing a record for this Court to examine if we were inclined to revisit our decision in Foster. We reaffirm Foster and find no merit in Jordan's claim.
Second, Jordan claims that the trial court should have granted his motion to disqualify the prosecutor, Jeffrey Ashton. The *712 basis for his motion was that Ashton participated in interrogating Jordan prior to his arrest. Ashton allegedly "denigrated defenses and mitigating circumstances and elicited information that helped establish aggravating circumstances." We find no merit in this claim. A review of the record demonstrates that Ashton did not engage in any unethical behavior. Indeed, we have previously acknowledged that a prosecutor's presence at the giving of a statement is not necessarily improper. Suarez v. State, 481 So.2d 1201, 1206 (Fla.1985). We further note that the cases cited by Jordan supporting his right to a disinterested prosecutor are inapposite to the instant case. Indeed, in large prosecutor's offices it is not unusual to find a capital or homicide division. Local law enforcement officers are often instructed to routinely call a prosecutor from that division to the scene of a homicide. To assure knowledgeable and competent prosecution, the prosecutor called to the scene is regularly assigned to the case. In general, this Court has no authority to intervene with this type of executive-branch personnel-assignment decision. We view Ashton's vigorous prosecution as simply a reflection of his diligence. We find no reason to conclude that improper considerations motivated Ashton in his efforts.
Third, Jordan also argues that it was error for the trial judge to limit his crossexaminations of Sam Tory and Officer John Parks. The State elicited testimony from Tory, on direct examination, that Jordan admitted to Tory that he had "popped" someone. This admission occurred on the Sunday morning following the murder. On Monday evening, Jordan reaffirmed to Tory that he had "popped someone" but added that he had no intent to kill the victim. The trial court limited the scope of the defense's cross-examination of Tory to the details of the first conversation. As a result, Jordan was unable to introduce evidence that he indicated, in his second conversation with Tory, the accidental nature of the shooting. Further, Tory told Officer Parks about his conversations with Jordan. The trial court would not allow Parks to testify, on cross-examination, as to the content of Jordan's second conversation with Tory. Jordan argues that section 90.108, Florida Statutes (1991), dictates that the trial judge erred in refusing to allow cross-examination as to the content of Jordan's second conversation with Tory. That section encompasses the principle known as the "rule of completeness." It reads as follows:
When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered contemporaneously. An adverse party is not bound by evidence introduced under this section.
Fairness is clearly the focus of this rule. Larzelere v. State, 676 So.2d 394, 402 (Fla.), cert. denied, ___ U.S.___, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). "Such a fairness determination falls within the discretion of the trial judge." Id. (citing Correll v. State, 523 So.2d 562, 566 (Fla.1988)). To that end, the "general unreliability of inadmissible evidence should be one of the court's considerations in determining whether fairness requires admission." Charles W. Ehrhardt, Florida Evidence § 108.1, at 35 (1995 ed.). The disputed conversation in this case is surely hearsay. The amount of time that passed between Jordan's first statement and his second statement only increases the unreliability of the hearsay. We cannot say that the trial judge abused his discretion by refusing to expand the scope of the cross-examinations at issue.
Fourth, Jordan claims that the trial court erred in denying his motion in limine that sought to prevent the State from arguing both premeditated murder and felony murder. Jordan claims that while the evidence may support a conviction for felony murder, it does not support a conviction for premeditated murder. The jury used a general verdict form and returned a verdict simply finding Jordan guilty of first-degree murder. The verdict form, being general, did not indicate the theory upon which the conviction rested. Jordan claims that his conviction is invalid under the following rationale from Mills v. Maryland, 486 U.S. 367, 376, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988):

*713 With respect to findings of guilt on criminal charges, the Court consistently has followed the rule that the jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching a verdict.
While this passage may seem determinative, Justice Scalia has clarified the limited scope of such an approach. Writing for the Supreme Court in Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), he distinguishes cases in which the jury may have relied upon a theory not supported in the law (legal error) from those cases in which the jury may have relied upon a theory not supported by the facts (insufficiency of proof). The distinction is drawn for the following reason:
Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to lawwhether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are wellequipped to analyze the evidence, see Duncan v. Louisiana, 391 U.S. 145, 157, 88 S.Ct. 1444, 1451-52, 20 L.Ed.2d 491 (1968). As the Seventh Circuit has put it: "It is one thing to negate a verdict that, while supported by the evidence, may have been based upon an erroneous view of the law; it is another to do so merely on the chanceremote, it seems to us, that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." United States v. Townsend, 924 F.2d 1385, 1414 (1991).
Id. at 59-60, 112 S.Ct. at 474. We conclude that there is no merit to the claim that the jury's general verdict is invalid. We have previously upheld the use of a general verdict form in these circumstances. See Parker v. Dugger, 660 So.2d 1386, 1390 (Fla.1995)(holding there was not ineffective assistance of counsel where attorney failed to challenge sufficiency of proof of felony murder when general verdict was returned and premeditation was supported by the evidence). Finally, we find that the record in the instant case supports both theories of first-degree murder.
Fifth, Jordan challenges his conviction for attempted robbery on double jeopardy grounds. He claims that he cannot be convicted of both felony murder and the underlying felony. We recently addressed this issue in Boler v. State, 678 So.2d 319 (Fla. 1996). We concluded that there is no constitutional infirmity in convicting a defendant of both felony murder and the qualifying felony. Accordingly, Jordan's claim has no merit and his conviction for attempted robbery is affirmed.
Sixth, Jordan forwards two claims of error as to jury selection. Jordan claims that the trial court inappropriately limited voir dire. We disagree. Our review of the record indicates that the trial judge acted well within the bounds of his discretion. See Vining v. State, 637 So.2d 921, 926 (Fla. 1994). Jordan also claims that the trial judge inappropriately denied a request to conduct individual and sequestered voir dire. Once again, this determination rests soundly within the discretion of the trial judge. E.g., Farina v. State, 680 So.2d 392, 396 n. 2 (Fla.1996); Davis v. State, 461 So.2d 67, 69 (Fla.1984). Many of our cases addressing the need for individual and sequestered voir dire arise in cases with extensive pre-trial publicity. E.g., Boggs v. State, 667 So.2d 765 (Fla.1996). To the extent that Jordan's claim regards pre-trial publicity, our review of the record indicates that the prosecutor was keenly aware of the problems pre-trial publicity could cause during voir dire. For example, the following exchange took place between prosecutor Ashton and potential juror Henderson:
Mr. Ashton: Mr. Henderson, juror number two, since you're first on the list, Mr. *714 Henderson, you indicated you haven't read or heard anything about this case?
Juror Henderson: I heard quite a bit about it. I misunderstood that.
Mr. Ashton: That's fine. Do you recall any great details [that] you may have heard or read about the case?
Juror Henderson: I heard that the young man did the killing
Mr. Ashton: Before you say anything that might influence another juror with something they hadn't read, let me cut to the end.
At this point do you feel you've formed an opinion about the guilt or innocence about the defendant that's on trial here today for the crime that he's charged with?
Juror Henderson: Yes, I did form an opinion.
Mr. Ashton: Do you feel that opinion is one that you cannotwould not be able to disregard in sitting and giving the defendant a fair trial in this case, or do you feel like at this point you just couldn't set it aside and act as if you never heard it?
Juror Henderson: I couldn't act as if I had never heard it, because I had gotten animosity in my heart about it.
Mr. Ashton: Thank you, sir.
We find that, in light of the general consciousness shown to the problems pretrial publicity can cause, the trial court was well within its discretion to deny individual and sequestered voir dire on the basis of such publicity. It seems, though, that the thrust of Jordan's claim is different. It focuses primarily on the effect that answers given by potential jurors to "probing" questions might have had on the rest of the venire. In fact, most of Jordan's specific examples of tainting arise from questions directed to topics other than pre-trial publicity. He argues that responses given to questions about the death penalty and possible mitigation influenced other potential jurors. He claims that other jurors "very likely" adopted those ideas as their own. The record fails to disclose either improper questions or "outrageous statements" sufficient to justify a finding that the trial judge abused his discretion. Consequently, we find no merit in this claim.
Having found no merit in any of Jordan's preliminary or guilt-phase issues, we accordingly affirm his convictions for first-degree murder and attempted robbery.

Penalty-Phase
Jordan contends that the trial court improperly allowed the prosecution to present, through the testimony of two witnesses, irrelevant, prejudicial, and incompetent evidence at the penalty-phase proceeding. We find merit in this claim and determine that a resentencing is needed.
At issue is the testimony of Carol Brown and Samuel Strang. Both witnesses were allowed to testify after a proffer and over the strenuous and repeated objections of the defense. Their testimony was presumably offered to support an instruction for the "heinous, atrocious, or cruel" statutory aggravating circumstance. No such instruction was eventually given to the jury.
The witness Brown is a therapist with a bachelor's degree in psychology and a master's degree in counseling. The general tone of Brown's testimony is exemplified by the following exchange that took place after the jury heard a description of the environment in which Jordan was raised. Brown stated:
Q [Ashton]: Is there literature, studies to document whether at some point persons who have grown up in that environment actually begin to take some pleasure from acts of violence?
A [Brown]: Yes, there is.
Q: Explain that to the jury, how is that possible, how does that work?
A: There are various theories, but it would be akin to a parachutist who likes to sky dive, who turns the fear into a pleasurable event so that the excitement and the adrenaline they receive from committing the violent act is turned over into a drug like substance in the brain, like opium, so they become addicted to the adrenaline flow, raises the endorphins in the mind to produce a calmness following the act.
Mr. West: I would object to this testimony on the basis that notwithstanding *715 Miss Brown's expertise as determined by the court, there's been no showing that she is an expert in brain chemistry, as a neurologist, is in any way competent to talk about the chemical activity of the brain.
Mr. Ashton: I agree, and
Mr. West: How it affects motions.
[Brown]: I was quoting from
Mr. Ashton: I agree. I don't think she's giving that opinion, and I'll have her specify she's relating literature.
Mr. West: I would like it to be relevant to this case rather than just quoting from literature.
The Court: Objection overruled.
By Mr. Ashton: Regardless of the reason for that relationship, is that a documented relationship between the environment and [actually] getting pleasure from violence?
A [Brown]: Yes.
Q [Ashton]: In looking at Mr. Jordan'sall the information you've been given, does he appear to fit that profile of offender who has come to gain pleasure from violence?
A [Brown]: Yes.
Presumptively, Brown's testimony was presented to "[prove] Jordan's `perception' when he chased a 76-year-old woman." We find that Brown's testimony did little to accomplish that feat. In fact, she stated in the recross examination during the proffer that she was unable to particularly say that Jordan enjoyed committing this crime. Her testimony was only aimed at relaying the profiles described by scientific literature. Based on those profiles, she opined, in front of the jury, that Jordan is a "sociopath without conscience" and "experiences a euphoria from his aggressive behaviors." The prosecutor reiterated these characterizations during closing argument. He stated that "giving pain and giving horror is what [Jordan] likes." Further, he added that "to [Jordan], making someone suffer is the most important thing." We again note that the trial judge refused to give an instruction on the "heinous, atrocious, or cruel" aggravating circumstance.
A witness may not testify to matters that fall outside her area of expertise. Hall v. State, 568 So.2d 882, 884 (Fla.1990). While a trial court has broad discretion in admitting expert testimony, such discretion is not boundless. Id. In this case, Brown's area of expertise was presented as follows:
BY MR. ASHTON:
Q State your name.
A Carol Brown.
Q How are you presently employed?
A I'm in private practice as a therapist.
Q What is your educational background?
A I have a bachelor's in psychology and the master is in counseling.
Q And during the years you've worked since getting your degrees, or while getting your degrees, what type of occupation do you have related to what you do today?
A During the years I got my degree?
Q Yes.
A I worked in domestic violence, spouse abuse, I worked in alcohol and drug rehabilitation and I worked for a couple of years with spousal abuse prevention in developing programs for abused children who had been sexually abused, those kinds of things. I work in the prison system.
Q What do you do today?
A Primarily focus on sex offender treatment, domestic violence, treating the survivor of sexual abuse and adolescent juvenile sex offenders and small children who have been abused.
The defense objected to the State's motion that Brown be qualified as an expert. The defense stated:
MR WEST: We object. Initially, on the grounds that it's notthis court has not been asked to identify any area within the broad spectrum of mental health issues for which this witness may be called to render an opinion.
THE COURT: Would the attorneys approach the bench.
(The following proceedings were had at the bench.)
THE COURT: I understand your initial objection. *716 Would you state all of your objections.
MR WEST: I won't know what they are until the court rules on that, because on these issues I would assume there would be a very specific area for which this person would be called upon to render an opinion, an area within the broad spectrum of the mental health issues, all the way from marital and family counseling to insanity for the purposes of defenses or competence to stand trial, simply too broad at this point.
THE COURT: Mr. Ashton?
MR. ASHTON: I've proffered the opinion I'm going to ask her. I don't know what label to put on that opinion. I don't think I have to put a label on it.
But she is sufficiently qualified to give an opinion in the area she did in the proffer.
In essence, that's what I'm asking for. I think she is qualified to mental health evaluations, if you will.
It's difficult to put labels on this type of thing.
THE COURT: I left my book in the other room.
I find that Carol Brown meets the standard set forth in the Evidence Code for evidence qualification to testify as [an] expert witness.
MR. WEST: In what area?
THE COURT: I find that she is able tobetter able than a lay person to testify in the area of mental health, and that hershe is qualified to render the opinions that we heard in the proffer.
MR. WEST: I asked her [a] specific question, whether she was in a position to state an opinion thatto a degree of reasonable psychological or therapeutic certainty, or what have you, that Keydrick Jordan enjoyed the act of killing Ann Mintner, and she said, no, she was not in a position to do that.
That's the ultimate issue for which she would be required to give an opinion, and the only conceivably relevant issue, and she's already answered that she can't do that.
THE COURT: I understand your objection. I overrule and qualify her as [an] expert.
Brown's area of expertise was never clearly defined by the trial judge. Her education was not definitively focused in the areas to which she testified. Degrees in psychology and counseling do not necessarily qualify one to testify to complicated profile evidence[8] taken from scientific literature. Here, it seems to us, Brown cannot reasonably be considered an expert in offender profile evidence. Her experiences confirm our finding. She was not, at the time of her testimony, working with either compiling or studying profile evidence. Her opinion as to the inner workings of Jordan's mind at the time of the killing was based heavily on literature she had read.[9] There is no absolute prohibition against qualifying an expert based upon "his or her study of authoritative sources without any practical experience in the subject matter." Ehrhardt, § 702.1, at 512. The problem in this case is that Brown did not demonstrate, in the record, a sufficient study of the scientific literature. Simply reading large amounts of scientific literature, all of which falls well outside a person's area of educational expertise, cannot serve to create an expert out of a non-expert. In this case, Brown testified to matters that were demonstrably outside of her areas of expertise. It was clearly an error for the trial judge to *717 qualify her as an expert. We find that the error cannot be considered harmless in this case. Jordan was labeled a "sociopath without conscience" in front of the jury. The jury recommendation of death was only by an eight-to-four margin. The error in qualifying Brown as an expert necessitates a new sentencing proceeding. This is especially true insofar as this error was compounded by the inappropriate testimony offered by Strang.
Strang is a clinical gerontologist. His testimony is exemplified by the following excerpt:
A [Strang]: The most recent research indicates that elderly people are probably not any more prone to the concern of crime than the other segments of the population.
Q [Ashton]: Are there exceptions to that general rule?
A [Strang]: Yes, the three exceptions generally are elderly women, elderly women that are approached in the street and elderly women that have a predisposition, presensitization by having been victimized previously.
....
Q [Ashton]: What is your opinion as to the level of anxiety that Miss Mintner would have experienced from the beginning of the crime until she fell unconscious, can you describe it for us?
....
A [Strang]: I would assume she was in abject terror, that this was probably her worst nightmare come true.
We have stated that "expert testimony should be excluded where the facts testified to are of such a nature as not to require any special knowledge or experience in order for the jury to form conclusions from the facts." Johnson v. State, 393 So.2d 1069, 1072 (Fla.1980). In this case, there was certainly no need for an expert to testify as to the fear Mintner was feeling in her confrontation with Jordan. Our common experiences dictate that an elderly woman approached in public by a man with a gun will be terrified. When a fact is so basic that an expert opinion will not assist the jury, an expert should not be allowed to testify. Ehrhardt, § 702.2 at 518. See also Lewis v. State, 572 So.2d 908, 911 (Fla.1990)(finding no error in exclusion of expert testimony to matters well within the common understanding of jury). Here, Strang's testimony served only to build sympathy within the jury for the victim. The trial judge erred in allowing such testimony. See generally Smith v. State, 674 So.2d 791 (Fla. 5th DCA 1996), review denied, 684 So.2d 1352 (Fla.1996)(finding improper expert testimony irrelevant to the proper jury role); Florida Power Corp. v. Barron, 481 So.2d 1309 (Fla. 2d DCA 1986)(finding improper expert testimony to matters of common understanding).
In light of the highly prejudicial testimony offered by Brown and the improper testimony offered by Strang, we conclude that Jordan was denied a fair and constitutional sentencing proceeding. We need not address Jordan's three other penalty-phase claims[10] in view of our determination that a resentencing is warranted.
Accordingly, we affirm Jordan's convictions of first-degree murder and attempted robbery but vacate his death sentence because of the admission of clearly improper expert opinion evidence in the penalty-phase proceeding. We remand for a new penaltyphase proceeding before a new jury and direct that this proceeding be held within 120 days of this opinion becoming final.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in conclusion only as to guilt phase and concurs in penalty opinion.
NOTES
[1] § 921.141(5)(a), Fla.Stat. (1995).
[2] Id. § 921.141(5)(b) (prior felonies of lewd assault upon a child, robbery, and first-degree murder).
[3] Id. § 921.141(5)(d).
[4] Id. § 921.141(5)(f).
[5] Id. § 921.141(6)(b).
[6] Id. § 921.141(6)(f).
[7] Id. § 921.141(6)(g)(age of twenty at time of crime and "normal" intelligence).
[8] We note that this profile evidence should have been tested for general acceptance within the relevant scientific community. See Frye v. United States, 293 F. 1013 (D.C.Cir.1923). It is this type of new or novel scientific profile evidence for which the safeguards of a Frye test are needed in order to guarantee reliability. The defense did not, however, specifically object on Frye grounds, leaving this issue unpreserved. See Hadden v. State, 690 So.2d 573 (Fla. 1997).
[9] According to Brown's testimony, she "did research. [She] got library lines, and [her] husband is a professor, [they] utilize[d] the library and pulled up, and did a computer line search, [they] pulled up everything that [they] could find." She concluded her proffer testimony, though, with saying that her testimony is "what's reported in the literature. And I can't tell you what was in his head because I wasn't there. But I can tell you the literature indicates [that Jordan probably experienced a feeling of excitement and exhiliration.]"
[10] Jordan also claims that: (1) the trial court erred in denying his motion for exculpatory evidence at the penalty-phase proceeding; (2) the trial court erred in allowing evidence that future legislation might result in Jordan's release from prison if a life sentence were imposed; and (3) his death sentence is constitutionally infirm.